# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 6, 2013

Lyle W. Cayce
Clerk

No. 12-50142

TERRI TRUITT, also known as Truitt Terri Griffith,

Plaintiff - Appellee

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, GRAVES and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

Plaintiff-Appellee Terri Truitt claimed that her lower-back, leg, and foot pain prevented her from working as an attorney. Defendant-Appellant Unum Life Insurance Company of America ("Unum") awarded Truitt long-term disability benefits. Years later, a former companion of Truitt provided Unum with emails indicating that, while claiming to be disabled, Truitt engaged in activities, such as traveling abroad, that were inconsistent with her asserted disability. Based, in part, on these emails, Unum denied Truitt's claims, and sought more than $1 million in reimbursements for benefits paid.

No. 12-50142

The district court found that there was substantial evidence to support Unum's denial of benefits. Nonetheless, the district court held, among other things, that the denial was procedurally unreasonable, and therefore an abuse of discretion, because Unum did not fulfill its duty to "consider the source" of the emails. In evaluating whether a plan administrator wrongfully has denied benefits under the Employee Retirement Income Security Act ("ERISA"), however, this court never has imposed a duty to investigate the source of evidence. Instead, the burden is on the claimant to discredit evidence relied on by the plan administrator. Because we find that Unum did not act arbitrarily and capriciously, we REVERSE.

## I. FACTS AND PROCEEDINGS

Truitt worked as a partner in the Houston office of the Mayer Brown law firm. Her expertise was international oil and gas litigation. In that capacity, she traveled abroad, to countries including Sweden and Turkmenistan, for arbitrations. "Lifting and handling boxes in excess of 25 pounds" was a "frequent requirement" of these trips.

Truitt claimed that she first experienced numbness and pain in her lower back, left leg, and left foot in 1999. Citing her continued pain and lack of mobility, Truitt stopped working in 2002. She also applied for long-term disability benefits.

The benefits plan (the "Plan"), administered by Unum, defined "disability" to mean that, "because of injury or sickness":

1.  the insured cannot perform each of the material duties of his regular occupation; or
2.  the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:
    a.  performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

       b.     earning currently at least 20% less per month than his indexed pre-disability earnings due to the same injury or sickness.

Note: For attorneys, "regular occupation" means the specialty in the practice of the law which the insured was practicing just prior to the date disability started.

Finding that Truitt was disabled under the terms of the Plan, Unum awarded her benefits in a May 2003 letter. However, Unum advised Truitt that it required updated medical information to "clarify [her] current restrictions and limitations." Unum also notified Truitt that it reserved the right to discontinue benefits, and to seek repayment of benefits paid, if, after receiving the updated information, it determined that she was no longer disabled.

Unum's continued review of Truitt's claim produced some evidence that supported Truitt's asserted disability. For example, neurologist Igor Cherches found: that Truitt had "constant intractable pain"; that she was unable to stand or walk for more than thirty minutes; and that she could not lift more than ten pounds. Internist Karen Hoermann found that Truitt was "unable to carry legal files required for employment," and that "pain prevent[ed]" her from "remaining seated for" more than one hour.

This continuing review also produced evidence inconsistent with Truitt's disability. For example, surveillance videos showed Truitt walking, driving, and bending down, and lifting and carrying boxes, bags, coolers, pumpkins, and a dog. After conducting an Independent Medical Examination ("IME"), orthopedic surgeon Michael Graham found that "it is clear that [Truitt] has little or no physical impairment."

Unum explained that, "[d]espite the inconsistencies between Truitt's stated symptoms and observed activities, [it] continued to pay benefits." Then, on March 1, 2006, occupational therapist Steven Clark conducted a functional capacity evaluation ("FCE") of Truitt. Clark found: that Truitt was "inconsistent

with her gait, lumbar range of motion, and posture"; that Truitt "was observed to be able to sit for up to 60 minutes at a time and stand for up to 50 minutes at a time"; and that Truitt was also "observed to be able to sit for approximately 2 hours of the total time she was observed in the clinic." Clark observed that, while he could not offer a recommendation because of Truitt's "self[-]limiting behaviors and inconsistencies in abilities," Truitt's condition improved when she was "unaware of observation."

Truitt contested Clark's findings. She wrote in an April 24, 2006 letter that Clark had "inflicted . . . intense pain" on her, and that, "[a]s a direct result of that exam, I since have been confined to bed rest for approximately 15 hours a day." However, Unum conducted additional surveillance from April 6-8 that showed Truitt: "removing items from the back seat of [her] Mercedes"; "scrubbing the seats"; driving neighbors; and unloading items from her vehicle.

Given this apparent inconsistency, Unum scheduled another IME. Physician Aaron Levine examined Truitt, reviewed her medical records, and watched her surveillance videos. Levine concluded that, although Truitt suffered from disc degeneration, her scores on physical tests showed a "severe perception of physical disability in excess of her physical findings." He added that, although sedentary work might "accentuate her symptoms," there was "nothing objective in my examination to prevent her from doing sedentary work."

In a twelve-page letter dated August 21, 2006, Unum notified Truitt that it was terminating her benefits. Unum explained that, based on its review of Truitt's medical records and the surveillance videos, there was "no objective information that supports [Truitt's] inability to perform [her] occupational demands as a trial attorney." Unum added that it believed Truitt could work as a trial attorney because she could "sit[ ] on a frequent to constant basis or on a prolonged nature" and "stand[ ] and walk[ ] for brief periods of time," and

No. 12-50142

because "[i]t would be reasonable that accommodations c[ould] be made" for her lifting restrictions.

Truitt filed an administrative appeal. She argued, among other things, that Unum did not fully consider the specific demands of her job, in particular her extensive business travel.

Vocational specialist Richard Byard reviewed Truitt's file. He found that Truitt's "occupation [did] not require repetitive bending, climbing, stooping or kneeling motions." He nonetheless concluded that the "physical demands" of Truitt's job "would exceed [her] level of work capacity" because the "business[-]related travel demands of her occupation," such as "lengthy flights," were "incompatible" with the "requirement that she 'be allowed to change posture as needed, likely 2-3 times per hour.'"

Based largely on Byard's findings, Unum notified Truitt in a July 2007 letter that it was reinstating her benefits. Unum again advised Truitt that she would need to provide "periodic updates of her medical status to determine if she remains eligible for continued benefits under the applicable policy provisions."

Around the same time that Truitt's benefits were reinstated, a man identifying himself as Andrew Mark Thomas called Unum. Thomas said: that he had been in a personal relationship with Truitt for "a number of years"; that Truitt had him "locked up" and deported to the United Kingdom; that, as a result, he wanted "to see the b**** locked up"; and that he had photos, travel itineraries, and other documents that showed that Truitt was not totally disabled. Thomas sent Unum a follow-up email asking to be paid six times "the current monthly payments made to" Truitt in exchange for providing "complete evidence that [she] is obtaining monthly (disability) payments under false preten[s]es." He warned: "This is a one[-]time offer, and no further thought will be given if you decide to decline."

5

No. 12-50142

Unum responded that it "does not pay for fraud[-]related information," but that Thomas was "free to call" if he was willing "to provide this information without compensation."

Thomas proceeded to provide, without compensation, some emails purportedly sent by Truitt. Unum asked Thomas if there were "any additional emails/information available which might shed additional light regarding this case?" Responding that "this is personal to me," Thomas provided Unum with additional emails.[1] In total, Thomas provided more than 600 pages of emails, spanning March 2005 to July 2007.

The emails revealed that, while Truitt claimed to be disabled, she apparently engaged in activities that were inconsistent with her asserted limitations. For example, the emails—which included flight and hotel itineraries, and eTickets—indicated that Truitt flew to: Amarillo, Texas; Oklahoma City; New York City; Akumal, Mexico; Cancun, Mexico; Jamaica; Guatemala; Venezuela; England; Ireland; France; and Italy:

- **March 15, 2005**: Truitt writes that she is "here in . . . NYC." In a later email, she references "hav[ing] been in NYC."
- **April 6, 2005**: Truitt writes: that she intends to be in Russia in October; that she "already paid for a trip to Ireland"; that she was "thinking of doing a road tour" of Ireland; and that she plans to return to Akumal. She later receives an itinerary listing her as flying to Ireland.
- **April 12, 2005**: Truitt writes to an employee at a Guatemala hotel that she "bid on and won . . . a three night stay" at the hotel, and that she would like to "extend [her] stay for a

---

[1] Thomas also offered to "sign an affidavit and give sworn evidence to a court if required." Unum responded that "[o]nce we have received and reviewed this documentation, we would create an affidavit for you to review and sign regarding this material." What happened next is unclear, but it appears that Thomas refused to provide an affidavit. Truitt swore, in a July 2011 affidavit, that she received a May 2011 email from Thomas in which he wrote: "I haven't actually given a signed statement or any more information to UNUM just yet, but *they keep asking me.* [Unum] has phoned & mailed me a couple of times, I've not responded to his requests yet." (Emphasis added.)

6

No. 12-50142

longer period." She later receives a reservation listing her as flying to Guatemala.

- **July 24, 2005**: Truitt writes that she is "scheduled to do some heavy[-]duty traveling Aug. through Dec. out of the country, mostly."
- **September 9, 2005**: Truitt forwards an itinerary listing her as flying to Oklahoma City. She also mentions that she has "rented a car in Okla City."
- **September 23, 2005**: Truitt writes: "I got on your same flights from Dallas to Rome . . . and have a seat next to yall for the Dallas to London leg of the trip. I will stay after you all leave Rome, and I will travel in France, etc. for a few weeks." She also forwards a flight itinerary listing her as traveling to Rome.
- **September 24, 2005**: Truitt writes that she has been in "6 different airports . . . in the last 48 hours."
- **September 28, 2005**: Truitt forwards an itinerary listing her as flying from Rome to Paris. She later forwards hotel reservations listing her as staying in France and Italy.
- **January 11, 2006**: Truitt books a hotel room in Jamaica.
- **May 31, 2006**: Truitt forwards an eTicket listing her as flying to Guatemala.
- **June 12, 2006**: Truitt forwards an itinerary listing her as flying from Rome to Paris.
- **June 16, 2006**: Truitt forwards an itinerary listing her as flying round trip from San Antonio to London.
- **August 31, 2006**: Truitt forwards an itinerary listing her as flying to Amarillo.
- **December 23, 2006**: Truitt forwards an itinerary listing her as flying to Cancun.
- **February 24, 2007**: Truitt writes that she is "going to be traveling lots beginning mid[-]April to mid[-]Sept this year."
- **April 10, 2007**: Truitt writes that she will be in Akumal, and that she is "thinking of flying straight from Cancun to Minneapolis."
- **May 11, 2007**: Truitt forwards an eTicket listing her as flying to England.
- **May 18, 2007**: Truitt forwards an email discussing a four-week hotel reservation in Akumal.
- **May 22, 2007**: Truitt forwards an itinerary listing her as flying to Venezuela.

7

No. 12-50142

The emails indicated that Truitt engaged in, or planned to engage in, activities that appear to be physically demanding:

- **April 4, 2005**: Truitt writes that she is dancing on her deck.
- **May 6, 2005**: Truitt writes that she's been "out working and riding," and that "[i]t's loads of work to keep up with 2 acres by myself, much less this house."
- **October 18, 2005**: Truitt writes that she's "[b]een busting a\*\* cleaning both my house and Julie's next door."
- **June 3, 2006**: Truitt writes that she is in Guatemala, and that she traveled in "[p]lanes, a van on the most winding, curving mountainous 2 lane road for 3 hours, then a boat ride across Lake Atitlan in the clouds and lightning! Good thing I'm a seasoned traveler!"
- **June 11, 2006**: Truitt writes: "I personally picked up 88 gallons of trash just on my property alone each day of the Memorial Day weekend."
- **March 26, 2007**: Truitt writes that, while in Europe, she and Thomas will be driving for two days to reach Italy.
- **May 13, 2007**: Truitt writes: "[W]e are all on our way to . . . the farm to shoot guns[.]"
- **May 19, 2007**: Truitt writes: "Had to clean [her house] for 2 days, total of about 14 hours, still didn't get it all done and broke my . . . back doing it."
- **May 23, 2007**: After expressing interest in sailing to an island off the coast of Venezuela, Truitt writes: "[W]e are ready to sail when you are!"
- **June 28, 2007**: Truitt writes that she is on an island off the coast of Venezuela, and "would like to do" a "fishing trip with snorkeling included."

The emails suggested that Truitt engaged in legal work:

- **July 24, 2005**: Truitt writes that she "ha[s] a hearing [she is] prepping for in the am."
- **January 2, 2006**: Truitt requests a meeting to discuss: "discovery issues"; "arbitration prep and strategy"; "fee arrangement"; "other items on case"; and "tasks for [Truitt] to assist with on the case." Truitt adds that she is "planning a European trip," but that, "[d]epending on the case, which will take top priority for me through the final hearing, I will fly back to work on it with you."

8

No. 12-50142

- **April 5, 2006**: Truitt writes that she "missed [a] board meeting" because she is "swamped working on a case about to go to mediation and trial."
- **May 12, 2006**: Truitt writes that she is "in trial this coming week in Houston."
- **May 25, 2006**: Truitt writes: "We finally finished our trial/arbitration last week after 4 years of toil and ordeal going after Prudential and Wachovia and their broker for stealing my Grandad's life savings in a Ponzi Scheme. . . . WE WON!"
- **October 27, 2006**: Truitt writes that she is "working on recreating [her] law practice . . . and focusing on mediation rather than litigation."
- **May 25, 2008**: Truitt writes: "After this Unum drama is over, I am hoping to have a part[-]time mediation practice in the San Antonio area[.]"[2]

The emails also implied that Truitt knowingly was misleading Unum:

- **October 11, 2005**: Truitt writes: "Fell today on the rainy steps . . . and banged myself up really good on both knees, one elbow, both wrists and right eye . . . and lips. I look like someone beat the s*** out of me. . . . The good news is that I am very sore, so that should help with tomorrow's exam."
- **April 21, 2007**: In response to an email from her attorney warning her to "be on the guard that [Unum] ha[s] used private eyes in the past and will probably still be using them," Truitt writes: "It looks like I have to stay put till Unum has made its determination."
- **April 22, 2007**: Truitt writes: "I hope to get a lot done. Trying to motivate myself, but must remember the cameras may be watching."
- **April 23, 2007**: Truitt writes: "Let me know if you need me to bring anything you may need or may have forgotten when I

---

[2] After initiating her lawsuit against Unum, Truitt explained in an affidavit that many of these emails reference a case to recover money stolen from her grandfather, and that, although she "attend[ed] the mediation and arbitration hearing," she "was not an attorney of record." Although "[w]e limit our review of the interpretation of a benefits plan under ERISA to the administrative record," *LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 841 (5th Cir. 2013), we note, as detailed below, that we do not rely on the emails suggesting that Truitt engaged in legal work to support our finding that the plan administrator properly terminated her benefits.

am finally able to come down [to Venezuela]. I'm pissed Unum is controlling my life once more."

- **April 24, 2007**: Truitt writes: "I am hoping Unum will have made some sort of determination so I can come see my honey in [Venezuela]."

- **May 8, 2007**: Truitt wrote to her attorney: "I had planned to go on a family vacation out of the country, but I certainly do not want to jeopardize our claim. What are your thoughts about this?" Her attorney responded: "You need to continue living your life."

In a March 2009 letter, Unum wrote: "It has come to our attention that [Truitt] has been engaging in the practice of law and that she has been traveling extensively by airplane internationally." As a result, Unum explained, it was suspending Truitt's benefits pending an investigation into her disability status. Unum added that, if Truitt "ha[d] additional information to support her request for disability," it would "be happy to reconsider her claim."

Truitt sent Unum a three-page affidavit. Truitt recounted how she had been assaulted by Thomas. She then stated: that Thomas was "a computer and hacker expert"; that he "copied onto his laptop virtually all of the data from my personal computer"; and that his "laptop also has computer hacking programs and communications stating that Mr. Thomas was planning to 'grass' me up to UNUM and steal money from me." Truitt characterized an email purportedly from Thomas—in which he threatened to tell Unum that he had "detailed knowledge & evidence of a long[-]term fraud being commi[t]ted by a[n] insured client of Unum"—as "threatening to send false information to UNUM." She also asserted that "[n]one of the statements Mr. Thomas threatened to make to UNUM are true."

Along with the affidavit, Truitt sent Unum documents confirming that Thomas pled guilty to assaulting Truitt by strangling her during a November 2007 camping trip. She also sent medical records, tax returns, and relevant case law.

10

No. 12-50142

Unum physician Suzanne Benson reviewed Truitt's updated file, which included these additional documents. Benson found that the "file information did not support clinically significant structural insufficiency at the knee or spine." Benson concluded: that the emails "describe claimant activity in excess of what she reported at the FCE and what [a]ttending [p]hysicians report she can do"; that "[t]ravel described in claimant e-mails was consistent with tolerance of constant sitting"; and that therefore "[a] requirement for a change in posture every 20 to 30 minutes is not needed and is not supported by the travel described in claimant e-mails."

"Because of the difference in opinion between Dr. Benson and Truitt's attending physicians," Unum had additional medical experts review the updated file. Physician Malcolm McPhee agreed that, although there was conflicting evidence of Truitt's disability, the emails "indicate that the claimant has been functioning at least at a light level of physical activity." Vocational consultant Anthony Morin concluded that "it would appear that [Truitt] would be able to perform the duties of her own occupation."

Unum notified Truitt in a fourteen-page letter dated October 27, 2009 that it was terminating her benefits. Unum first explained that "[t]he flight itinerary information we received, as well as e-mails, which originated from [Truitt], contradict statements she made to us during the course of her . . . claim." For example:

- Truitt contacted Unum on August 20, 2005 to say: that her condition had gotten worse; that her mother was taking care of her; that she would not be able to attend an FCE scheduled for September 2, 2005; and that she would not be available until September 24, 2005. Yet Truitt's travel records showed that she was traveling in Europe between August 7, 2005 and September 22, 2005.
- Truitt told Unum in an April 24, 2006 letter that, since a March 1, 2006 FCE, she had "been confined to bed rest for approximately 15 hours per day." Yet video surveillance on

11

No. 12-50142

> April 6, 2006 showed Truitt "driving for most of the day and removing several items from her vehicle."

- Truitt told physician Levine during a June 9, 2006 IME that she had stayed in bed for 15 hours a day since the March 1, 2006 FCE. Yet "[d]uring this time period, some of the activities she was performing included international traveling, working, purchasing tickets to attend a Gala event, riding and keeping up two acres of property by herself."

Unum then concluded, relying on the emails, medical reports, and surveillance videos, that Truitt was not disabled under the terms of the plan because: she "has clearly demonstrated the ability to sit and stand for extended periods of time"; she "was able to perform activities beyond her repeated limitations"; she was "not only able to travel, but in fact traveled extensively both nationally and internationally"; and she "continued to practice law." Unum further advised Truitt that, because she wrongfully received benefits from March 2005 through August 2007, she owed Unum more than $1 million in reimbursements.

Truitt filed a thirty-one page administrative appeal challenging Unum's termination of benefits. Although seeming to acknowledge that she had been "traveling internationally for recreation,"[3] Truitt argued that the surveillance videos and emails were unreliable. Specifically, Truitt maintained that "the information provided by Thomas is no basis for suspension or denial of benefits" because "Thomas is biased and willing to do anything to hurt Ms. Truitt."

Truitt also sent Unum expert reports in support of her appeal. Insurance claims expert Ted Marules concluded that Unum wrongfully based its denial of benefits on a "biased interpretation of selected medical information," an "inaccurate description of [Truitt's] actual job responsibilities and daily activities," and "[i]nformation provided by a known criminal whose intent was

---

[3] In her appeal, Truitt characterized her apparent trips abroad as "traveling internationally for recreation," but did not dispute that she took such trips. Instead, she focused on the distinction between recreational and business travel.

No. 12-50142

clearly biased towards" Truitt.  Rehabilitation counselor Barbara Dunlap found that the "[a]bility to take a vacation involving international travel does not equate with the mental and physical rigors of work[-]related travel."  She also observed that "[c]onversational emails have no objective measure of reliability or validity; the subjective information contained within an email can be fabricated and exaggerated and conversational emails are frequently on the same level as gossip."  "[E]lectronics countermeasure expert" Dennis Chevalier noted that "[e]mail and password thefts are extremely easy . . . for the novice and expert to do," and that "[b]ecause this is such an easy activity to perform by anyone, information obtained from these emails has to be suspect."

In response to Truitt's appeal, Unum again reviewed her claim. Vocational expert Byard, who previously had concluded that the business travel required by Truitt's job "would exceed [her] level of work capacity," found that his "prior concerns" were "no longer . . . relevant."  Rebutting Dunlap's assertion that recreational travel does not equate to business travel, Byard noted that Truitt's "frequen[t] and extensive[ly] demonstrated recreational travel can be viewed as a direct measure of her ability to successfully participate in business[-]related air travel."  Physician Andrew Krouskop likewise concluded that, "[c]onsidering the claimant's conditions in aggregate, no additional restrictions are supported."

Unum notified Truitt in a July 2010 letter that it was upholding its decisions to discontinue benefits and seek reimbursement of the more than $1 million in overpayments.  Unum again detailed the medical records, vocational reviews, and emails that supported its decisions.  Unum then explained: "While you state in your appeal letter that email information can be manipulated and tampered with you have not demonstrated that this has occurred in this case." Unum added: "The emails between [Truitt] and Mr. Thomas not only discuss personal matters but they also contain specific references to what was

13

happening during [Truitt's] disability claim. Thus, your statements that conversational emails are not reliable and are on the same level of gossip are incorrect as it pertains to this claim."

Truitt filed suit, alleging that Unum wrongfully terminated her benefits. Unum filed a counterclaim seeking to recover more than $1 million in benefits it alleged that Truitt fraudulently obtained.

The district court granted Truitt's motion for judgment based on the administrative record. The district court explained that it was "not holding the record lacks substantial evidence in support of Unum's decision." Instead, the district court found that, although Unum's administrative process is not "limited to considering only legally admissible evidence," the "decision Unum made to rely on Thomas' emails, and the weight it granted the information contained in them, was arbitrary and capricious." Given that "Unum has failed to establish Plaintiff's representations to it were false," the district court also rejected Unum's counterclaim for reimbursement of overpayments. Unum appeals.

## II. ANALYSIS

The two issues on appeal are (1) whether the plan administrator abused its discretion in denying Truitt's benefits; and (2) whether Truitt must reimburse more than $1 million in benefits.

**(1) Unum's Denial of Benefits**

"This court reviews *de novo* the district court's conclusion that an ERISA plan administrator . . . abuse[d] its discretion in denying benefits, and in doing so reviews the plan administrator's decision from the same perspective as the district court." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 511-12 (5th Cir. 2010) (per curiam) (internal citation omitted).

The district court found, and the parties do not dispute, that the benefits plan at issue in this case gave Unum discretionary authority to construe the terms of the plan and render benefits decisions. We therefore review the plan

administrator's decision to deny benefits for abuse of discretion. *See Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009).

A plan administrator abuses its discretion if it acts "arbitrarily or capriciously." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir. 1999) (quoting *Sweatman v. Commercial Union Ins., Co.*, 39 F.3d 594, 601 (5th Cir. 1994)).  A decision is arbitrary and capricious only if it is "made without a rational connection between the known facts and the decision or between the found facts and the decision." *Meditrust*, 168 F.3d at 215 (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996)); *see Vega v. Nat'l Life Ins. Servs., Inc.* 188 F.3d 287, 302 (5th Cir. 1999) (en banc) (observing that there only need be "concrete evidence in the administrative record that supports the denial of the claim"), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008); *Holland*, 576 F.3d at 247 ("Our 'review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even on the low end.'") (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007)).

In deciding whether there was an abuse of discretion, we also consider whether the plan administrator has a conflict of interest. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  A plan administrator has a conflict of interest if it "both evaluates claims for benefits and pays benefits claims." *Glenn,* 554 U.S. at 112.  "[C]onflicts are but one factor among many that a reviewing judge must take into account." *Id*. at 116.  "[A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id*. at 117.  "The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggests a higher likelihood that it affected the benefits decision, including, but not limited

to, cases where an insurance company administrator has a history of biased claims administration." *Id.*; *see Holland*, 576 F.3d at 248 (observing that "the specific facts of the conflict will dictate its importance"). "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy[.]" *Glenn*, 554 U.S. at 117.

The district court found, and the parties do not dispute, that there was substantial evidence to support Unum's decision to deny Truitt's benefits. The parties also do not argue that Unum denied Truitt a "full and fair review" of her benefits claim.[4] This appeal therefore reduces to whether Unum otherwise abused its discretion in denying Truitt's benefits.

A. Unum's Finding that Truitt was not Disabled

The district court found that a "factor the reviewing court may consider in determining whether the administrator abused its discretion [is] whether circumstances surrounding the administrator's decision suggest 'procedural unreasonableness.'" The district court acknowledged that "Unum's administrative process is [not] limited to considering only legally admissible evidence," but nonetheless found that Unum (i) did not "investigat[e] into the accuracy of the information it gleaned from the emails," and (ii) did not fulfill its "duty to consider the source of the information it considers and weigh the

---

[4] A plan administrator fails to provide a "full and fair review" if it does not comply with the "procedures set forth in [29 U.S.C.] § 1133 of ERISA and in the Department of Labor regulations promulgated pursuant to that section." *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 393 (5th Cir. 1998). These procedures require, among other things, that a plan administrator provide a claimant with "specific reasons" for terminating benefits, *see Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392-93 (5th Cir. 2006), and identify "medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination." *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009) (quoting 29 C.F.R. § 2560.503-1(h)(3)(iv)). As discussed below, the "procedural unreasonableness" of a plan administrator's decision is a separate concept that is a subset of our conflict of interest analysis.

information accordingly." The district court concluded that the "decision Unum made to rely on Thomas' emails, and the weight it granted the information contained in them, was arbitrary and capricious."

This concept of "procedural unreasonableness" traces to the Supreme Court's *Glenn* decision. In *Glenn*, a plan administrator denied a claim for benefits based on the Social Security Administration's ("SSA") finding that the claimant could do sedentary work. *See* 554 U.S. at 118. The Supreme Court observed that this "course of events . . . suggested procedural unreasonableness" because the plan administrator initially had urged the claimant to argue to the SSA that she could not work. *Id.* In *Schexnayder. v. Hartford Life & Accident Ins. Co.*, this court interpreted the Supreme Court's reference to "procedural unreasonableness" to mean that a "reviewing court may give more weight to a conflict of interest, where the circumstances surrounding the plan administrator's decision suggest 'procedural unreasonableness.'" 600 F.3d 465, 469 (5th Cir. 2010). This court concluded: "Although substantial evidence supported [the plan administrator's] decision, the method by which it made the decision"—that is, the plan administrator's "[f]ailure to address a contrary SSA award"—"was unreasonable, and the conflict, because it is more important under the circumstances, acts as a tiebreaker for us to conclude that [the plan administrator] abused its discretion."[5] *Id.* at 471. This court's subsequent decision in *Crowell v. CIGNA Grp. Ins.* reinforced that a plan administrator's "procedural unreasonableness" informs "how much weight to afford the apparent conflict." 410 F. App'x 788, 793-94 (5th Cir. 2011).

This precedent indicates that whether the plan administrator's decision is "procedurally unreasonable"—that is, whether the "method by which [the plan administrator] made the decision was unreasonable"—is a factor that informs

---

[5] The SSA found that Truitt was "not disabled under [its] rules." Truitt does not argue, and the record does not support, that Unum gave any weight to the SSA's finding.

whether the "reviewing court may give more weight to [the plan administrator's] conflict of interest." *Schexnayder*, 600 F.3d at 469-71. This precedent does not support that procedural unreasonableness is an independent basis on which a district court can find abuse of discretion.[6]

The district court did not indicate whether its finding of procedural unreasonableness was an independent basis for holding that the plan administrator abused its discretion. The district court erred to the extent that it treated procedural unreasonableness as anything more than a component of its analysis of Unum's conflict. However, even if the district court only considered procedural unreasonableness within the framework of its conflict analysis, it nonetheless erred by imposing a burden on Unum that is absent from our case law.

*(i) Unum's Duty to Investigate*

The district court first found procedural unreasonableness, in part, because Unum did not "investigat[e] into the accuracy of the information it gleaned from the emails." However, this court's unanimous *en banc* decision in *Vega v. Nat'l Life Ins. Servs., Inc.* forecloses imposing such a duty to investigate on a plan administrator. *See* 188 F.3d at 299. In *Vega*, the panel decision imposed a "duty to conduct a good faith, reasonable investigation" on a plan administrator that had a conflict of interest. *Id.* at 289. The *en banc* court overturned the panel decision, holding that, "when confronted with a denial of benefits by a conflicted administrator, the district court may not impose a duty to reasonably investigate on the administrator." *Id.* at 299. The *en banc* court explained:

> There is no justifiable basis for placing the burden solely on the administrator to generate evidence relevant to deciding the claim,

---

[6] By contrast, "full and fair review," discussed above, is an independent basis to overturn a plan administrator's denial of benefits. *See Lafleur*, 563 F.3d at 160.

which may or may not be available to it, or which may be more readily available to the claimant. If the claimant has relevant information in his control, it is not only inappropriate but inefficient to require the administrator to obtain that information in the absence of the claimant's active cooperation.

Instead, we focus on whether the record adequately supports the administrator's decision. In many cases, this approach will reach the same result as one that focuses on whether the administrator has reasonably investigated the claim. The advantage to focusing on the adequacy of the record, however, is that it (1) prohibits the district court from engaging in additional fact-finding and (2) encourages both parties properly to assemble the evidence that best supports their case at the administrator's level.

*Id.* at 298. This court has reiterated, in cases subsequent to *Vega*, this principle "that a conflicted administrator is not under a duty to 'reasonably investigate' a claim." *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 331-33 (5th Cir. 2001) (finding that the district court erred by imposing a duty to investigate on the plan administrator); *see, e.g., Dramse v. Delta Family-Care Disability & Survivorship Plan*, 269 F. App'x 470, 479 (5th Cir. 2008) (per curiam) (same). Accordingly, Unum did not violate its duty to investigate because no such duty exists.[7]

*(ii) Unum's Duty to Consider the Source of Evidence*

The district court also faulted Unum for not "consider[ing] the source of the information it considers and weigh[ing] the information accordingly." However, the parties do not identify, and we could not find, a case in which we imposed on a plan administrator an affirmative duty to consider the source of

---

[7] We nonetheless note that Unum made an effort to investigate the accuracy of the emails. First, after Thomas provided the first batch of emails, Unum asked if there were "any additional emails/information available which might shed additional light regarding this case?" Second, according to an email from Thomas that Truitt quoted in her July 2011 affidavit, Unum "ke[pt] asking" Thomas to "give[ ] a signed statement or any more information." (Emphasis added.) Third, Unum compared the events described in the emails to Truitt's claim file.

evidence. The primary case relied on by the district court for the proposition that a plan administrator has a duty to consider the source of evidence, *Pierre v. Conn. Gen. Life Ins. Co.,* instead stands for the proposition that, by itself, hearsay evidence cannot support a plan administrator's finding unless the evidence "meet[s] certain indicia of reliability." *See* 932 F.2d 1552, 1562-63 (5th Cir. 1991) (noting that, if "the evidence had been only the . . . hearsay statement . . . unsupported by corroborating evidence, then the abuse of discretion standard would permit us to conclude that, because of the witness's self-serving interests, the decision to deny benefits based on this statement, without more, would be beyond the bounds of a reasonable judgment," but concluding that "the plan administrator's decision was based on corroborating evidence," and therefore "was not an abuse of discretion"). We reiterate that, in the context of ERISA, evidence is tested through a probing administrative process, and that, in that process, issues of inauthenticity, contradiction, unreliability, and bias all may be pertinent. This probing process contemplates that the plan administrator must first identify evidence to support its decision to deny benefits. *See Robinson*, 443 F.3d at 392-93 (observing that, under 29 U.S.C. § 1133, a plan administrator must identify "specific reasons" for denying benefits). Then the claimant may attempt to discredit that evidence by, among other things, attacking its source. *See Vega*, 188 F.3d at 298 ("If the claimant has relevant information in his control, it is not only inappropriate but inefficient to require the administrator to obtain that information in the absence of the claimant's active cooperation."); *Pierre*, 932 F.2d at 1554 ("The plaintiffs . . . contested the accuracy and admissibility of [the] hearsay statements."). And, finally, the plan administrator will consider whether, given its asserted deficiencies, the evidence in question continues to support its decision to deny benefits. *See Vega*, 188 F.3d at 298 ("[W]e focus on whether the record adequately supports the administrator's decision."); *Pierre*, 932 F.3d at 1562-63 (noting that, despite the

claimant's assertion that the hearsay evidence in question was unreliable, there was nonetheless sufficient evidence to support the plan administrator's decision to deny benefits). As we summarized in *Vega*, therefore, "[t]here is no justifiable basis for placing the burden solely on the administrator to generate evidence relevant to deciding the claim, which may or may not be available to it, or which may be more readily available to the claimant." 188 F.3d at 298.

Unum adhered to this process. Unum first identified evidence to support its decision to deny Truitt's benefits, including: the emails showing that Truitt engaged in activities, including international travel, that were inconsistent with her asserted disability; the surveillance videos showing that Truitt was able to drive, walk, and bend, and lift and carry pumpkins, dogs, coolers, and other items, with no apparent discomfort; and evaluations by physicians and vocational consultants finding that there was little objective evidence to support Truitt's subjective reports of pain and lack of mobility.

Truitt then provided evidence of her own in rebuttal, including: an affidavit from Truitt swearing that Thomas was "a computer and hacker expert" and that he "threaten[ed] to send false information to Unum"; documents showing that Thomas pled guilty to assaulting Truitt; and expert reports providing that "[c]onversational emails have no objective measure of reliability or validity," and that "[e]mail and password thefts are extremely easy."[8]

Unum then considered, and rejected, Truitt's rebuttal evidence. After having two more medical experts review Truitt's file, Unum concluded that the surveillance videos, medical records, and emails continued to support its decision

---

[8] Truitt maintains that she was unable to rebut Unum's evidence because "from March 4, 2009 until October 27, 2009, Truitt unsuccessfully sought no less than **13 times** to discover the basis for Unum's denial and to respond thereto." As Unum notes, however, "[a] decision to terminate Truitt's benefits was not made until October 27, 2009, and she was provided with a complete copy of her file by November 4, 2009. Truitt's appeal was requested over four months later on March 18, 2010 and additional documents were forwarded on April 28, 2010."

to terminate Truitt's benefits.  Unum specifically addressed Truitt's challenge to the emails, observing that, "[w]hile you state in your appeal letter that email information can be manipulated and tampered with you have not demonstrated that this occurred in this case," and that "[t]he emails between [Truitt] and Mr. Thomas not only discuss personal matters but they also contain specific references to what was happening during [Truitt's] disability claim."

Given this probing process—which included a thorough discourse of disability—coupled with the deference we owe plan administrators, *see Holland*, 576 F.3d at 246, we cannot say that Unum's decision to consider the emails was an abuse of discretion.  Truitt did not introduce any evidence that the emails were forged or hacked. *Cf. Pierre*, 932 F.2d at 1563 (noting that the plan administrator asked the claimant to "submit any evidence" to dispute the contents of the hearsay, but that it "[r]eceiv[ed] no additional information" from the claimant).  Moreover, the emails showed that Truitt traveled abroad extensively, for weeks at a time, yet Truitt did not introduce evidence showing that, at any point when the emails indicated that she was abroad, she instead was in the United States.  Instead, she seemed to confirm the accuracy of the emails by appearing to acknowledge that she had been "traveling internationally for recreation."  The emails also showed: that Truitt was "out working and riding" to "keep up with 2 acres by [her]self"; that she rode in a "van on the most winding, curving mountainous 2 lane road for 3 hours"; that she "personally picked up 88 gallons of trash" in a single weekend; and that she "[h]ad to clean [her house] for 2 days, total of about 14 hours."  Truitt never denied engaging in any of these physical activities, but instead submitted an affidavit stating generally that Thomas "threaten[ed] to send false information to Unum," and that "[n]one of the statements Mr. Thomas threatened to make to UNUM are true."  Although Truitt submitted expert reports stating, generally, that "[c]onversational emails have no objective measure of reliability or validity," and

that "[e]mail and password thefts are extremely easily," the reports did not identify any specific discrepancies suggesting that the emails were inauthentic or compromised.

Two other factors further support the plan administrator's decision to credit the emails. First, the emails appeared to be authentic. They spanned more than 600 pages, and included eTickets and hotel and flight reservations. Second, the time line presented in the emails was consistent with Truitt's claim file. For example, the emails showed that Truitt was traveling in Europe from August 20, 2005 to September 22, 2005; Truitt's file showed that, after Unum scheduled an FCE for September 2, 2005, Truitt told Unum that she would not be available until September 24, 2005.

Given that the emails "me[t] certain indicia of reliability"—facial authenticity, a time line consistent with Truitt's file, and either acknowledged by her or only indirectly disavowed—we cannot say that Unum decision to credit the emails was "beyond the bounds of a reasonable judgement." *Pierre*, 932 F.2d at 1563 (finding that there was an abuse of discretion because "the plan administrator's decision was based on corroborating evidence").

*(iii) Substantial Evidence of Disability*

The district court found in the alternative that, "[e]ven if Unum's acceptance of the emails were not an abuse of discretion . . . Unum's conclusion that the emails establish Truitt is able to perform her own occupation [was] arbitrary" because Truitt's travels "fall[ ] somewhat short of" extensive, and because "even extensive leisure travel cannot be viewed as equivalent to the rigors of business travel." These findings are in tension with the district court's conclusion that there was substantial evidence to support Unum's denial of benefits. These findings also overlook that the plan administrator identified considerable evidence other than the emails—including, as discussed above,

surveillance videos and medical records—to support its decision to terminate Truitt's benefits.

Although we decline to substitute our judgment for that of the plan administrator, *see Schadler*, 147 F.3d at 398, we further note that, even conceding that "each of the material duties of [Truitt's] regular occupation" involved extensive travel and lifting files, there was "concrete evidence in the administrative record that support[ed] the denial of the claim." *Vega*, 188 F.3d at 302.

First, there was concrete evidence that Truitt could engage in extensive business travel. The emails showed that Truitt traveled to locales including England, France, Rome, Venezuela, Guatemala, Jamaica, and Mexico, for weeks at a time, while claiming to be disabled. The emails also showed that Truitt's travel schedule was rigorous. Truitt wrote: that she was "scheduled to do some heavy[-]duty traveling Aug. through Dec. out of the country"; that she had been in "6 different airports . . . in the last 48 hours"; that she was "going to be traveling lots beginning mid[-]April to mid[-]Sept this year"; and that she rode in "a van on the most winding, curving mountainous 2 lane road for 3 hours." Likewise, medical experts found that Truitt could engage in business travel, noting: that "[t]ravel described in claimant e-mails was consistent with tolerance of constant sitting"; that "[a] requirement for a chance in posture every 20 to 30 minutes is not needed and is not supported by the travel described in claimant emails"; and that "recreational air travel trips . . . can be viewed as a direct measure of her ability to successfully participate in business[-]related air travel."

Second, there was concrete evidence that Truitt could lift files. The surveillance videos showed Truitt: walking, driving, and bending down, and lifting and carrying boxes, bags, coolers, pumpkins, and a dog. The emails showed that Truitt: was "out working and riding" to "keep up with 2 acres by [her]self"; that she "personally picked up 88 gallons of trash" in a single

weekend; and that she "[h]ad to clean [her house] for 2 days, total of about 14 hours." Likewise, medical experts found: that "it is clear that [Truitt] has little or no physical impairment"; that there was a "severe perception of physical disability in excess of her physical findings"; and that "it would appear that [Truitt] would be able to perform the duties of her own occupation."

Given that the emails, surveillance videos, and medical records show that Truitt could complete the "material duties of [her] regular occupation," there was "concrete evidence in the administrative record that support[ed] the denial of the claim." *Vega*, 188 F.3d at 302.

B. Unum's Conflict of Interest

Because we find that Unum's factual determination that Truitt was capable of performing her job duties was not an abuse of discretion, the issue before us further narrows to whether Unum's structural conflict of interest, evaluated against the backdrop of its asserted history of biased claims administration, supports finding an abuse of discretion.

The district court found, and the parties do not dispute, that Unum had a structural conflict of interest because it "both determines whether Truitt is eligible for benefits and pays for benefits out of its own pocket." The district court then gave greater weight to this conflict because "a number of courts . . . have recognized Unum's history of biased claims administration."

We agree that Unum had a structural conflict of interest. *See Glenn*, 554 U.S. at 112. However, the district court gave improper weight to this conflict. *See id*. at 117. The district court relied on five cases decided between 2007 and 2010, including its own decision in *Burton v. Unum Life Ins. Co.*, 2010 WL 2430767, at *10 (W.D. Tex. June 14, 2010), to show that Unum had a "history of biased claims administration." Yet the full *Burton* decision reveals that "Unum has—since *Glenn*—adopted new claims-handling practices" that have helped cure this history of "biased claims administration." 2010 WL 2430767, at *11.

Indeed, the district court in *Burton* relied on these "new claims-handling practices" to conclude that it would "not assume Unum is biased every time it denies a claim merely because it has a parsimonious claims-granting history." *Id*. Other decisions subsequent to *Burton* likewise have recognized Unum's improved "claims-handling practices." *See, e.g.*, *Daniel v. UnumProvident Corp.*, No. CV-04-1073, 2010 WL 8292157, at \*15 (E.D.N.Y. Oct. 27, 2010); *Hagopian v. Johnson Fin. Grp., Inc. Long-Term Disability Plan*, No. 09-C-926, 2010 WL 3808666, at \*11-12 (E.D. Wis. Sept. 23, 2010).

We also note, based on our "case-specific" review of the complete administrative record, that "circumstances" do not "suggest a higher likelihood that" Unum's conflict "affected the benefits decision." *Glenn*, 554 U.S. at 117; *see Holland*, 576 F.3d at 248-49. As discussed in detail above, Unum conducted a years-long investigation into Truitt's disability. During that investigation, Unum consulted with, or reviewed reports by, more than ten medical and vocational experts, only some of whom were aware of the emails. Unum gave Truitt opportunities to introduce evidence in support of her disability, and to rebut its evidence showing that Truitt was not disabled. Unum also appeared to give due consideration to Truitt's claim, as evidenced by its initial appellate decision to restore Truitt's benefits.

Given Unum's "new claims-handling practices," *see Burton*, 2010 WL 2430767, at \*11, and our "case-specific" finding that Unum gave careful consideration of Truitt's claim, *see Glenn*, 554 U.S. at 117, we find that the district court improperly emphasized Unum's structural conflict. *See Holland*, 576 F.3d at 248-49.

Even if we were too imbue Unum's structural conflict with "great importance," however, this conflict, which is "but one factor among many that a reviewing judge must take into account," does not support finding an abuse of discretion. *See Glenn*, 554 U.S. at 116-17. As discussed above, surveillance

videos, medical records, and emails all supported that Truitt was not disabled under the terms of the plan. Therefore, Unum's structural conflict was "clearly outweighed by the substantial evidence supporting [Unum's] decision." *Crowell*, 410 F. App'x at 794.

In sum, we hold: that Unum did not have an affirmative duty either to investigate the accuracy of the emails or to investigate and further consider their source; that, instead, Truitt failed to discredit Unum's proof through the administrative process; and that, therefore, Unum did not arbitrarily and capriciously rely on and weigh the emails and other items of evidence relating to Truitt's condition. We also hold that the district court gave improper weight to Unum's structural conflict, but that, regardless of the weight assigned to the conflict, Unum did not abuse its discretion.

**(2) The Reimbursement of Benefits**

Unum filed a counterclaim seeking reimbursement of more than $1 million in benefits that it alleged Truitt fraudulently obtained. Applying Texas law, the district court found that Truitt did not defraud Unum because Unum did not establish, among other things, that it relied on Truitt's representations. Unum argues, and Truitt does not actively dispute, that the district court erred by applying Texas law.[9]

We agree that federal common law, and not Texas law, governs Unum's counterclaim. ERISA does not outline how a plan administrator may recover benefits that it alleges were fraudulently obtained, *see* 29 U.S.C. § 1132(a)(3), and "[w]e have consistently held that any hiatus in ERISA's text must be filled by application of federal common law rather than the law of any particular

---

[9] Truitt did not appeal the district court's initial ruling that Unum's counterclaim qualified as "appropriate equitable relief" under the terms of the plan. Because this issue is not before us on appeal, and because it is not necessary to our finding, discussed below, that the district court incorrectly applied Texas law, we decline to address this ruling.

state." *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348, 358-59 (5th Cir. 2003) (finding, in the context of ERISA, that Texas law did not apply when evaluating "whether a showing of either actual fraud or unjust enrichment . . . is required before a constructive can be imposed on . . . disputed funds"); *see Provident Life & Accident Ins. Co. v. Sharpless*, 364 F.3d 634, 641 (5th Cir. 2004) ("Federal common law governs rights and obligations stemming from ERISA-regulated plans[.]").

This misapplication of Texas law affected the district court's analysis. The district court found that Unum did not satisfy the Texas standard for "fraudulent misrepresentation," which requires that "the party acted in reliance on the representation." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001). In so finding, the district court based its analysis on the Texas rule that "where a [party] makes [its] own investigation of the facts, or relies on expert opinion [it] has [itself] obtained, [it] cannot sustain a cause of action based upon misrepresentation by others." (Quoting *Ehler v. St. Paul Fire & Marine Ins. Co.*, 66 F.3d 771, 774 (5th Cir. 1995) (applying Texas law).) The district court found that Unum "obtained numerous opinions from a variety of consultants and experts" and thus, "[a]bsent the requisite reliance" on Truitt's representations, "Unum's counterclaim for fraud fails." Yet this court has not listed reliance as an element of fraudulent misrepresentation under federal common law. *See Sharpless*, 364 F.3d at 641.

The district court's erroneous finding that the emails were not credible also may have affected its analysis. The district court based its finding that Truitt did not defraud Unum, in part, on its conclusion that "the 'evidence' of falsity Unum relies on is questionable in its reliability." Although we decline to address whether the emails establish "evidence of falsity" for the purpose of fraudulent misrepresentation, we note, as discussed above, that the emails

appeared facially reliable, presented a time line consistent with Truitt's claim file, and were not persuasively discredited by Truitt.

Given that the district court incorrectly applied Texas law, that the district court based its analysis on a principle of Texas law that is not controlling under federal common law, and that the district court's finding that the emails were unreliable also may have affected its analysis, we vacate the district court's holding that Truitt did not fraudulently obtain benefits, and remand for further proceedings. *See Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 644-46 (5th Cir. 1992).[10]

## III. CONCLUSION

Accordingly, we REVERSE the district court's holding that Unum wrongfully denied Truitt benefits, and RENDER judgment for Unum. We VACATE the district court's holding that Truitt did not fraudulently obtain benefits, and REMAND for further proceedings consistent with this opinion. We also VACATE the district court's award of attorney's fees to Truitt, and REMAND for further proceedings consistent with this opinion.

---

[10] Correspondingly, we vacate the district court's award of attorney's fees to Truitt, and remand for further proceedings. *See Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2157-59 (2010).