**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 15-40597

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2015

Lyle W. Cayce
Clerk

JUDY HAGEN,

Plaintiff - Appellant

v.

AETNA INSURANCE COMPANY; HEWLETT PACKARD COMPANY,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before JOLLY, HAYNES, and COSTA, Circuit Judges.

HAYNES, Circuit Judge:

Plaintiff Judy Hagen ("Mrs. Hagen") brings this suit against defendants Aetna Life Insurance Company ("Aetna") and Hewlett Packard Company ("Hewlett Packard") to recover benefits as the beneficiary of her husband's group life insurance plan under 29 U.S.C. § 1132(a)(1)(B). She appeals from the district court's final judgment affirming the decision of the ERISA plan administrator to deny her benefits. For the reasons explained below, we AFFIRM.

## I. Background

Mrs. Hagen's husband, David Hagen, was an employee of Hewlett Packard and participated in the company's Comprehensive Welfare Benefits Plan, which included Basic Life Insurance Coverage and Basic and Supplemental Accidental Death and Personal Loss ("AD&PL") coverage under

No. 15-40597

a plan issued and administered by Aetna. Mr. Hagen's AD&PL policy (the "Policy") was effective on January 1, 2010, and he named his wife, Mrs. Hagen, as the beneficiary.

The terms of the Policy state that to receive payment under the accidental death benefit provisions, Aetna must receive proof that, inter alia, death "was a direct result of a bodily injury suffered in an accident." The Policy states that an "accident" is "a sudden and external trauma that is; unexpected; and unforeseen; and is an identifiable occurrence or event producing, at the time, objective symptoms of a [*sic*] external bodily injury." To qualify as a covered "accident," an occurrence or event "must not be due to, or contributed by, an illness or disease of any kind including a reaction to a condition that manifests within the human body or a reaction to a drug or medication regardless of the reason [the insured] ha[s] consumed the drug or medication." The Policy defines "injury" as "[a]n accidental bodily injury that is the sole and direct result of . . . [a]n unexpected or reasonably unforeseen occurrence or event . . . or the reasonable unforeseeable consequences of a voluntary act by the person." The Policy specifies that "[a]n injury is not the direct result of illness," and defines illness as "[a] pathological condition of the body that presents a group of clinical signs and symptoms and laboratory findings peculiar to it and that sets the condition apart as an abnormal entity differing from other normal or pathological body states."

Additionally, the Policy contains several exclusions that preclude receipt of benefits for a loss when the loss is caused or contributed to by "bodily or mental infirmity," "illness, ptomaine, or bacterial infection," "use of alcohol," "use of intoxicants," or "medical or surgical treatment." However, a loss that is caused or contributed to by illness, ptomaine, or bacterial infection, or medical or surgical treatment is *not* excluded when the loss is caused by "an

2

infection which results directly from the injury . . . [or] [s]urgery needed because of the injury."

On August 6, 2010, while the Policy was in effect, Mr. Hagen fell in his home, fracturing his right hip. Mr. Hagen was taken to the hospital where he was told he would require hip surgery. The doctors who examined him noted Mr. Hagen's extensive medical history and that he suffered from a number of ongoing health problems. He was a regular smoker and a chronic alcoholic who drank two six-packs of beer a day; he had previously suffered from lung cancer; he suffered from increased pedal edema, hyperkalemia, and a deep vein thrombosis in his right leg; and at the time of the fall, he suffered from Chronic Obstructive Pulmonary Disorder (COPD). One physician's notes discuss Mr. Hagen's diagnosis of COPD, and state that Mr. Hagen reported that he could not walk long distances, had a history of difficulty with falls, and felt he was severely limited. The doctor concluded that his level of functioning due to his COPD had been very poor. Additionally, Mr. Hagen was generally malnourished, was minimally ambulatory, and spent most of his time lying in bed or sitting. Mr. Hagen had surgery for his hip; although he initially seemed to be recovering from surgery, he ultimately died a couple of weeks afterward.

An autopsy was performed the following day, and the report states that Mr. Hagen's cause of death was "complications of blunt force trauma of lower extremity with intertrochanteric fracture of femur" and lists as contributory causes Mr. Hagen's COPD, chronic alcoholism, and hypertensive cardiovascular disease. Under manner of death, the report reads: "Accident (Fell)."

Following Mr. Hagen's death, Mrs. Hagen timely submitted a claim to Aetna for AD&PL benefits under the Policy. Aetna requested, received, and reviewed Mr. Hagen's medical records, and on October 12, 2011, informed Mrs. Hagen that her claim was being denied because

> [t]here [was] nothing in the file indicating that Mr. Hagen suffered a bodily injury in an accident that was significant enough to cause his death and his death was the result of that injury, rather his death was caused or contributed to by a bodily infirmity, illness and disease, use of alcohol, use of intoxicants and medical or surgical treatment which are limitations excluded by the Policy."

Mrs. Hagen requested that Aetna review its first determination, and on March 7, 2012, Aetna denied Mrs. Hagen's claim for a second time. Aetna acknowledged in this denial letter that it should not have initially denied the claim based on the Policy's exclusions for medical or surgical treatment, or Mr. Hagen's use of alcohol or use of intoxicants, but concluded that Mr. Hagen's "death was more consistent with his pulmonary compromise, and not injuries from his fall." Further, it concluded that "his fall was caused or contributed to by his overall poor health status, and would therefore be excluded under the terms of the Policy." Thus, two possible bases for Aetna's denial emerge: (1) that Mr. Hagen's fall was not an "accident" because it was caused or contributed to by his various illnesses; and (2) that his death was not a covered "loss" because it was not caused by injury from the fall, but rather resulted from his contributing medical conditions.

Mrs. Hagen filed suit against defendants under 20 U.S.C. § 1132(a)(1)(B), seeking recovery of the AD&PL plan benefits. On cross-motions for summary judgment, the district court adopted the magistrate judge's report and recommendation and granted judgment for Aetna. Mrs. Hagen timely appealed.

## II. Jurisdiction and Standard of Review

This case presents a claim for recovery of group life insurance benefits governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). The district court had subject matter jurisdiction over this action pursuant to

No. 15-40597

29 U.S.C. § 1132(e)(1).  We have jurisdiction to review the district court's grant of summary judgment in favor of defendants under 28 U.S.C. § 1291.

We review a district court's grant of summary judgment de novo, applying the same standards as the district court.  *Trinity Universal Ins. Co. v. Emp'rs Mut. Cas. Co.*, 592 F.3d 687, 690 (5th Cir. 2010).  When, as here, the language of an ERISA benefits plan grants the plan administrator discretionary authority to interpret the plan and determine eligibility for benefits, the plan administrator's denial of benefits is reviewed for an abuse of discretion.  *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651–52 (5th Cir. 2009).  To avoid reversal, the plan administrator's determination "must be supported by substantial evidence in the administrative record."  *High v. E-Systems Inc.*, 459 F.3d 573, 576 (5th Cir. 2006) (citing *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th Cir. 2004) ("If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail.")).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cooper*, 592 F.3d at 652 (quoting *Ellis*, 394 F.3d at 273).  We do not "engage in full review of the motivations behind every plan administrator's discretionary decisions[,]" *Crosby v. La. Health Serv. and Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011), but instead "assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end," *Corry v. Liberty Life Assurance Co. of Bos.*, 499 F.3d 389, 398 (5th Cir. 2007).

### III. Discussion

Mrs. Hagen contends that the district court erred in adopting the Report and Recommendation of the magistrate judge by: (1) failing to reduce the deference afforded Aetna's determination in light of Aetna's conflict of interest; (2) concluding that substantial evidence supported Aetna's determination that

No. 15-40597

Mr. Hagen's fall was not an accident; and (3) failing to conclude that Aetna's interpretation of the Policy's exclusions clause was contradictory to the plain language of the Policy.[1]

### A. Aetna's Conflict of Interest

Mrs. Hagen argues that the district court should have reduced the level of deference afforded Aetna's determination because Aetna had a conflict of interest as both the insurer and the administrator of Mr. Hagen's plan. Specifically, Mrs. Hagen contends that Aetna's conflict of interest should be given greater weight as a factor in the court's analysis for three reasons: (1) Aetna's claims process was procedurally unreasonable; (2) Aetna has a history of biased claims administration; and (3) Aetna did not take steps to reduce its potential bias in this case. Defendants concede that Aetna was operating under a conflict of interest, but argue that the magistrate judge appropriately considered all of the circumstances of Aetna's claims administration and correctly found that the evidence to support decreasing the level of deference was lacking.[2]

In reviewing a plan administrator's determination of benefits, we take into consideration whether the administrator has a conflict of interest,

---

[1] Because we conclude that substantial evidence in the administrative record supports Aetna's determination that Mr. Hagen's fall was not a covered "Accident," we need not reach this last point.

[2] More specifically, Mrs. Hagen argues that the district court erred in adopting the magistrate judge's recommendation that Aetna should be given "all but a modicum of deference." This language, cited by both the magistrate judge and Mrs. Hagen, refers to the "sliding-scale" methodology this court used to assess the potential impact of a conflict of interest before the Supreme Court's holding in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008). Although the magistrate judge relied on outdated language in assessing Aetna's determination in light of its conflict of interest, the effect of the magistrate judge's analysis was to consider Aetna's conflict as a factor, as required by *Glenn*. *See Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 248 n.3 (5th Cir. 2009). In our de novo review of the district court's judgment, we will consider Aetna's conflict as merely a factor among others in weighing whether Aetna abused its discretion.

meaning the administrator "both evaluates claims for benefits and pays benefits claims." *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d at 497, 508 (5th Cir. 2013) (citing *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 112 (2008), and *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). "[C]onflicts are but one factor among many that a reviewing judge must take into account . . . [and] should prove more important . . . where circumstances suggest a higher likelihood that [the conflict] affected the benefits decision . . . [and] less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn,* 554 U.S. at 116–17. Circumstances suggesting a higher likelihood that a plan administrator's conflict of interest affected their decision exist where the insurer has a history of biased claims administration or where the circumstances surrounding the determination suggest procedural unreasonableness. *Truitt,* 729 F.3d at 508–09 (quoting *Glenn,* 554 U.S. at 117–18, and *Schexnayder v. Hartford Life & Accident Ins. Co.,* 600 F.3d 465, 469 (5th Cir. 2010)). The factors we consider are case specific, and any one factor may "act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.* at 117. "[A] conflict of interest does not change the standard of review but affects only the amount of deference given under an abuse of discretion standard of review." *Green v. Life Ins. Co. of N. Am.,* 754 F.3d 324, 330 n.4 (5th Cir. 2014).

1. Procedural Unreasonableness of Aetna's Claims Process

Mrs. Hagen argues that Aetna's process in reaching its determination on her claim was procedurally unreasonable because Aetna took 400 days to make a determination, a medical opinion purportedly used in making the determination was "missing," and Aetna did not take precautions to avoid bias in this case. We hold that the administrative record supports the district

court's conclusion that Aetna's determination of Mrs. Hagen's claim was not procedurally unreasonable.

Mrs. Hagen points first to the lengthy delay involved in Aetna's determination of her claim as evidence of procedural unreasonableness. We conclude that the evidence does not support an inference that the delay was a "fishing expedition." *See Truitt*, 729 F.3d at 515 (finding that an administrator gave "careful consideration" of a claim after a "years-long investigation" during which it "consulted with, or reviewed reports by, more than ten medical and vocational experts" and gave the claimant opportunities to introduce evidence in support of her claim).

Mrs. Hagen also points to an unfulfilled medical referral as evidence of procedural unreasonableness. Before Aetna issued the first denial of Hagen's claim, it issued a referral for a medical consultant, Margaret Centurelli, to review Mr. Hagen's medical records, but there were no opinions by Centurelli provided to Mrs. Hagen as a result of that referral. Mrs. Hagen suggests that this disappearance indicates that either Centurelli did not complete the referral, or that Aetna did not retain her opinions. Aetna has clarified through the affidavit of Beth Johnson, a Senior Life Claim Analyst, that Centurelli ultimately did not complete the referral because at the time she did not handle the type of medical review required for Mrs. Hagen's claim. Johnson further explains that she ultimately determined that a medical review was not needed because there was sufficient evidence in the administrative record to deny the claim without one. Mrs. Hagen has not proffered contrary evidence, and this evidence does not show procedural unreasonableness. There is no indication that, in deciding not to seek medical review, Aetna ignored relevant evidence in the administrative record or requested information from Mrs. Hagen that it then refused to review. *See, e.g.*, *Glenn*, 554 U.S. at 118 (finding it procedurally unreasonable to request that claimant petition the Social Security Administration

for benefits and then ignore that agency's finding of disability in its own independent review); *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 250 (5th Cir. 2009) ("Holland did not supplement the record with other evidence in this case, nor can he point to evidence that the Plan Administrator failed to consider.")

Finally, Mrs. Hagen argues that the fact that Aetna's reason for denying her claim in its second denial was different from the reason given in the first letter denying her claim evinces procedural reasonableness. Mrs. Hagen is correct that Aetna, to some extent, changed its rationale for denying her claim in its second denial. But the fact that Aetna slightly altered its basis for denial during its second review, which included the medical review of a nurse consultant, is not evidence of procedural unreasonableness. If anything, it demonstrates that Aetna's review process involved giving Mrs. Hagen's claim a meaningful second look. Ultimately, Mrs. Hagen has not provided evidence that suggests that the method by which Aetna made its determination in her case was procedurally unreasonable.

2. History of Biased Claims Administration

Mrs. Hagen contends that Aetna's conflict should be given greater weight in the court's analysis because it has a history of biased claims administration. The only evidence cited by Mrs. Hagen in support of this claim is the fact that the nurse consultant, Lynn Kenney, Aetna employed to review Mr. Hagen's medical record has denied 17 of the 20 claims she reviewed for Aetna over the last five or six years, and that Kenney is Aetna's employee.[3] Mrs. Hagen

---

[3] Mrs. Hagen also complains that Aetna refused to allow her to depose Kenney regarding her prior claim denials. This allegation misstates the record. The record evidence Mrs. Hagen cites in support of this contention shows only that Aetna objected to an interrogatory that sought identification of all claims in which Aetna interpreted the plan exclusions relied upon in denying Mrs. Hagen's claim, and that Mrs. Hagen never noticed the deposition of Kenney (or any other Aetna witness regarding Aetna's history of interpreting the relevant plan exclusions). This can hardly be interpreted as a refusal by Aetna to permit Mrs. Hagen to depose Kenney.

contends that "Aetna financially benefits from Nurse Kenney's history of denials, and Nurse Kenney financially benefits from Aetna." This evidence alone is insufficient to show a history of biased claims administration. First, the mere fact that Kenney has denied a majority of the claims she has reviewed, without any additional information regarding the context of those denials, does not show that Aetna's claims administration is biased. *Compare Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 776 (8th Cir. 2009) (finding that insurer had a history of biased claims administration based on well-documented pattern of "erroneous and arbitrary benefit denials, bad faith contract misinterpretations, and other unscrupulous tactics"), *with Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 768 (5th Cir. 2010) (rejecting a "batting average" approach to assessing the weight to give a plan administrator's conflict of interest, wherein the plaintiff compared the number of federal decisions reversing denials of benefits to the number of decisions affirming denials). Nor does the mere presence of an employment relationship between the nurse consultant and Aetna suffice to demonstrate that Aetna has a history of biased claims administration. *See Jurasin v. GHS Prop. & Cas. Ins. Co.*, 463 F. App'x 289, 292 (5th Cir. 2012)[4] (requiring specific evidence that employee had a specific stake in the outcome of plaintiff's claim, such as the company paying employee more for denials than for grants of benefits (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575–76 (7th Cir. 2006)).

3. Steps Taken to Reduce Bias

Finally, Mrs. Hagen contends that Aetna's conflict of interest is a more significant factor because there is no evidence in the record that Aetna has taken any steps to reduce its potential bias or promote accuracy in its claims

---

[4] Although *Jurasin* is not "controlling precedent," it "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).

determinations. While there are steps, such as "walling off claims administrators from those interested in firm finances, or . . . imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits," *Glenn*, 554 U.S. at 117, that an insurer can take to reduce its potential bias, there is no requirement that an insurer do so. Absent other evidence suggesting procedural unreasonableness or warranting treatment of the conflict as a more significant factor, the mere fact that Aetna did not utilize any such precautions is not sufficient to justify giving Aetna's conflict greater weight. *Cf. Schexnayder*, 600 F.3d at 470–71 (weighing an insurer's failure take precautions to minimize an inherent conflict of interest in favor of finding bias only after noting the circumstances independently suggested procedural unreasonableness that contributed to an impression of bias). Accordingly, we conclude that Aetna's conflict of interest need not be given greater weight in considering whether Aetna abused its discretion.

*B. Whether Substantial Evidence Supports Aetna's Determination that Mr. Hagen's Fall Was Not an "Accident"*

We now consider whether substantial evidence supports Aetna's determination that Mr. Hagen's fall was not an "accident," as that term is defined under the Policy. To be entitled to payment of an accidental death benefit under the Policy, the claimant must provide proof that death "was a direct result of a bodily injury suffered in an *accident*." "Accident" is a defined term that means "a sudden external trauma that is; unexpected; and unforeseen; and is an identifiable occurrence or event producing, at the time, objective symptoms of a [*sic*] external bodily injury" and is not "due to, or contributed by, an illness or disease of any kind." Aetna contends that Mr. Hagen did not suffer a covered "accident," because his fall was due to or contributed to by his illness. Thus, the inquiry before us is whether there is

11

No. 15-40597

substantial evidence in the record to support Aetna's determination that Mr. Hagen's fall was due to or contributed to by his illness.[5]

Mrs. Hagen contends that there is no such evidence in the administrative record. Instead, she argues that the record plainly shows that Mr. Hagen experienced no light-headedness, headache, seizure, chest pain, shortness of breath, palpitations, sweating, vomiting, increase in cough, fever or chills, dizziness, vertigo, loss of consciousness, or blurry vision before the fall. Rather, Mrs. Hagen claims that the evidence supports only the conclusion that Mr. Hagen fell because he either slipped, tripped, or lost his balance, and that the fall was purely an "accident" as defined by the Policy. Aetna contends, conversely, that Mr. Hagen's fall was due to or contributed to by his illnesses.

There is certainly evidence in the record to support Mrs. Hagen's account of Mr. Hagen's fall. But the question for this court is not whether substantial evidence supports Mrs. Hagen's account of Mr. Hagen's fall, but whether "some concrete evidence in the administrative record" supports Aetna's determination that Mr. Hagen's fall was due to or contributed to by his illness. *Robinson v. Aetna Life Ins., Co.*, 443 F.3d 389, 395 (5th Cir. 2006) (citation omitted).

We conclude that there is sufficient evidence in the record to support such a determination. For example, on August 4, 2010, two days before Mr. Hagen's fall, his primary physician documented that Mr. Hagen himself

---

[5] The parties dispute the level of causation required by the terms of the plan. Mrs. Hagen contends that there must be substantial evidence that Mr. Hagen's illness was a *but-for* cause of his fall for her claim to be excluded. Defendants seem to argue that the plan requires only that the illness be a *contributing* cause. Courts have long struggled to interpret causation standards in policy exclusion clauses like the one at issue here. *See, e.g.*, *Sekel v. Aetna Life Ins. Co.*, 704 F.2d 1335, 1337–38 (5th Cir. 1983); *Hall v. Metro Life Ins. Co.*, 259 F. App'x 389, 594 (4th Cir. 2007); *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 355–56 (5th Cir. 2015). Because we conclude that there is substantial evidence to support the conclusion that Mr. Hagen's illness was a but-for cause of his fall, we need not resolve this dispute.

12

reported "feeling fatigue, having trouble eating, feeling dizzy, muscle pain, weakness in legs, [and that his] right and left leg[s] [were] swollen." The physician also noted that Mr. Hagen's "breathing seem[ed] much worse," that he "fe[lt] extremely tired," that his "muscles [were] very weak," and that he was experiencing "swelling of [his] legs." The physician then created treatment plans for Mr. Hagen's diagnoses of edema, fatigue and malaise, weakness of muscles, hypokalemia, and COPD. Medical records from Mr. Hagen's hospital stay after his fall note that Mr. Hagen had recent complaints of lower extremity swelling, that as a result of his COPD, Mr. Hagen reported that he could not walk long distances, had a history of difficulty with falls, and felt he was severely limited, and that Mr. Hagen's level of functioning due to his COPD had been very poor. At least one account of Mr. Hagen's fall states that Mr. Hagen fell because he "was somewhat dazed after getting out of bed," which is consistent with his reported fatigue and muscle weakness caused by his COPD. Additionally, there is no evidence in the administrative record that Mr. Hagen tripped over an object or slipped on a substance on the ground, which would be more consistent with an accident rather than a fall caused by illness.

We conclude that this evidence is sufficient to permit a reasonable mind to reach the conclusion that Mr. Hagen's fall was due to or contributed to by illness. Even accounting for Aetna's conflict of interest as both insurer and plan administrator, we hold that Aetna did not abuse its discretion in determining that Mr. Hagen's fall was not a covered "accident" under the terms of the Policy, negating recovery under the Policy. Thus, we need not reach the other arguments regarding the cause of death. Accordingly, Aetna's denial of Mrs. Hagen's claim was not an abuse of its discretion.

## IV. Conclusion

Because we conclude that Aetna did not abuse its discretion in denying Mrs. Hagen's claim for benefits, we AFFIRM.