# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 7, 2011

No. 09-51086

Lyle W. Cayce
Clerk

RONALD CROWELL,

Plaintiff - Appellant

v.

CIGNA GROUP INSURANCE, Life Insurance Company of North America
"LINA" Improperly Named as CIGNA Group Insurance; LIFE INSURANCE
COMPANY OF NORTH AMERICA,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
U.S.D.C. No. 6:08-cv-00281

Before DAVIS, WIENER, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Ronald Crowell appeals the district court's grant of summary judgment for
Life Insurance Company of North America (LINA), which denied his claim for
long-term disability benefits under his former employer's insurance policy.
Crowell also appeals the district court's order denying his motion to enforce a
putative settlement agreement with LINA. We AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

## BACKGROUND AND PROCEDURAL HISTORY

Ronald Crowell worked as a supervisor of outbase operations for ABX Air, Inc.  As an employee of ABX, Crowell was covered by an employee benefit plan established by ABX ("the Plan"), which is governed by ERISA,[1] and insured by LINA.[2]  Although ABX is named as the Plan Administrator, ABX designated LINA as a Plan Fiduciary, giving LINA full discretion to decide claims and appeals and make necessary determinations, such as interpreting terms of the Plan.  The Plan provides the following pertinent terms:

Definition of Disability/Disabled

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1.      unable to perform the material duties of his or her Regular Occupation; and

2.      unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

. . . .

Regular Occupation

The occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location.

In October 2004, Crowell underwent treatment for serious heart problems. As a result of his condition, Crowell claimed disability benefits under the Plan. LINA approved Crowell's claim and paid him short-term disability benefits while he was convalescing.  After expiration of the short-term benefits, LINA approved Crowell's continued receipt of long-term disability benefits, which began on

---

[1] *See* 29 U.S.C. § 1001 *et seq.*

[2] Although CIGNA Group Insurance is named as a defendant, LINA underwrote the Plan and is apparently the only interested defendant.

April 26, 2005. LINA proceeded to monitor Crowell's condition and in July and October 2005, requested information on Crowell's rehabilitation from his treating physicians. Crowell's cardiologist, Dr. Rodney Brown, provided LINA with information that Crowell's condition had improved and that he would be able to return to work without restriction starting on December 27, 2005. LINA wrote Crowell in late November 2005 to tell him that LINA would stop paying him benefits on December 26, 2005. In early December 2005, LINA received more information from Dr. Brown, confirming his earlier prognosis that Crowell could return to unrestricted work on December 27, 2005. However, in early January 2006, Dr. Brown sent another letter to LINA, in which he expressed a contrary opinion:

> At this time, I feel that the patient can not return to his original management position, which required overall responsibility of Hub operation. He is unable to perform the stress related function required for that position, including on call and extended hours.
>
> Mr. Crowell is restricted to a specific work area of responsibility and reduced hours beginning with six hours per shift for two weeks then seven hours per shift for two weeks, then 8 hours per shift there after and no more than forty hours a week.
>
> . . . . His prognosis is good.

Dr. Brown did not provide any medical records, evaluations, examinations, or tests that informed his changed opinion.

Crowell returned to work full-time at ABX on January 16, 2006, in a new position as sort center manager, which had a lower pay rate than Crowell's former position as supervisor of outbase operations. Meanwhile, Crowell appealed LINA's decision to terminate his long-term disability benefits. His appeal asserted that his medical condition made it impossible for him to manage the long shifts ("averaging 10-12 hours per day") and the "stress involved with managing multiple locations and being on call 24 hours per day/7 days per week," which his previous position at ABX demanded. He relied on Dr. Brown's January 2006 letter, and another letter from Dr. Brown dated September 6,

3

2006.[3]  However, neither Crowell nor Dr. Brown provided LINA with additional information to support his disability claim, which contradicted Dr. Brown's December 2005 opinion that Crowell was able to return to work full time.

In assessing his appeal, LINA undertook a new and complete review of Crowell's file.  As part of the review, LINA employed a vocational rehabilitation counselor (VRC) who reviewed descriptions of Crowell's original and new positions with ABX, and the relevant job descriptions in the Department of Labor's Dictionary of Titles.  The VRC found that Crowell's original occupation, as defined in the national economy (per the definition of "regular occupation" in the Plan), would not require Crowell to work sixty hours per week.  LINA's Medical Director also reviewed Crowell's file and the available medical evidence from Crowell's physicians and determined that they did not support Dr. Brown's changed position, i.e., that Crowell had a functional impairment.  As a result, LINA denied Crowell's appeal and he initiated this lawsuit.

---

[3] Although Dr. Brown's September 6, 2006, letter does not appear in the record on appeal, the parties do not dispute what it said: In his December 2006 appeal letter to LINA, Crowell quotes a portion of the letter as follows:

> "[Paul] is not able to work an[d] eight, ten, or twelve hours shift. I feel that he is getting fatigued and I suspect that is because his beta blocker as well as ACE inhibitors and his Aldactone. I am afraid if I stopped everything that has improved his heart function that although his fatigue may improve dramatically with discontinuing the Coreg his left ventricular dysfunction may resurface and we will be right back in the same boat that he was in from the beginning. Thus, as you can see I am quite hesitant to do that. Although his function has improved to 50% back in August 2005 and a MUGA in September 2005, he still does have a depressed left ventricular function. I feel that he is going to be unable to do his full-time employment for which he has been carrying out."

In its summary judgment papers below, LINA quotes some of the same portions of Dr. Brown's letter as well as another excerpt:

> Mr. Crowell has been followed by me since October 2004 until currently. He applied for disability in the past but has been denied due to my evaluation. I just recently saw him. He is 6'6", 271 pounds. His biggest complaint is just fatigue. He denies chest pain. He is just having trouble maintaining his work load at work. I feel that, although I do not have any objective evidence of this as determined by a stress test (I have done that and he has done fairly well) he is not able to work and eight, ten, or twelve hour shift.

In his response to LINA's summary judgment motion, Crowell did not dispute this recitation of Dr. Brown's letter and therefore, it may be assumed undisputed for purposes of LINA's motion for summary judgment.  *See* Fed. R. Civ. P. 56(e)(2).

As litigation was underway, Crowell's and LINA's attorneys began to negotiate a settlement. Crowell's attorney sent a demand letter dated June 23, 2009, to LINA's attorney detailing Crowell's benefits claim under the Plan. Among other things, the letter stated, "Mr. Crowell will receive the same long-term disability pay until he reaches the age of 65 at the reduced rate. . . . Further, he will receive 15 paychecks in 2016 until his birthday on August 12 at the reduced rate . . . ." LINA's attorney sent an email to Crowell's attorney a week later asking for clarification:

> In the first paragraph on the second page, you state that Crowell will receive paychecks through 2016. However, I understand that Crowell no longer works for ABX Air. Are you referring to disability checks or is there some arrangement that allows for Crowell to continue receiving checks from ABX Air? We are working on our response to the demand and need to better understand the foregoing in order to do so.

Crowell's attorney responded: "I was referring to disability checks and the difference between what he receives now and what he would have received under his previous salary." Again, LINA's counsel asked for clarification about whether Crowell would be receiving future payments from ABX, and "that the future disability pay referenced in the letter refers to future checks alleged to be due from LINA and not from ABX Air." The record reveals no response from Crowell's attorney.

Over the following two weeks, the parties negotiated the amount of the settlement and reached an agreement on September 11, 2009, to settle for $60,000. Expressly left unresolved in this proposed agreement were matters of confidentiality and the amount of the settlement that would be paid for confidentiality, as well as the terms of the release of claims to benefits under the Plan. LINA filed a Notice of Settlement with the district court on September 16, 2009, and requested instructions from Crowell's counsel on payment of the settlement proceeds. The next day, however, before the funds were paid, LINA's counsel discovered, apparently for the first time, that in late 2008, Crowell had

filed a second claim for benefits under the Plan arising from the same alleged disability. LINA's attorney told Crowell's attorney that as part of the settlement—as understood by LINA—Crowell would be required to release any claim to those benefits as they arose from the same disability claim that was the subject of his lawsuit and the settlement agreement. Crowell refused to release his claim to future benefits, insisting that he had only negotiated to settle his claim to past benefits owed by LINA, and not to future benefits.

Crowell moved to enforce the settlement agreement, which the district court denied. The court found that there had been no meeting of the minds because each party was negotiating to settle difference claims—Crowell intended to settle only claims for past payments, while LINA intended to settle all claims, for past and future payments. Thereafter, LINA moved for summary judgment, which the district court granted, finding that substantial evidence supported LINA's decision to deny Crowell's claim and that LINA therefore did not abuse its discretion. Crowell appeals from the district court's orders denying his motion to enforce the settlement agreement and granting summary judgment for LINA.

## DISCUSSION

### I.   Settlement Agreement

Crowell argues that the district court erred in refusing to enforce the tentative settlement agreement reached between him and LINA. Crowell contends that the agreement was negotiated at arm's length, reflected a meeting of the minds, and that LINA has not shown that the parties were acting under a mutual mistake in reaching their agreement. According to Crowell, LINA was on notice that he intended only to negotiate the settlement of his *past* claims under the Plan and was not negotiating to settle his future claims. Crowell points to the statement by his lawyer in his June 23, 2009, demand letter that referenced Crowell's continued receipt of "paychecks" for his disability benefits and to his lawyer's response to LINA's inquiry about those payments in which

6

his lawyer told LINA's counsel, "'I was referring to disability checks and the difference between what [Crowell] receives now and what he would have received under his previous salary'" (emphasis omitted).

LINA argues that a fair reading of Crowell's demand letter is that it included all of Crowell's disability benefits, past and future; that his attorney's clarifying email did not specify the nature of his ongoing benefits "paychecks"; and that reading those communications in light of the Amended Complaint, which demanded complete relief for benefits owed, past and future, the settlement agreement was not a product of a meeting of the minds, or was at least infected by a mutual mistake. Furthermore, LINA contends that the fact that the settlement agreement left unresolved the issue of the confidentiality of the agreement also demonstrates that the parties had not reached a final enforceable agreement.

"Although federal courts possess the inherent power to enforce agreements entered into in settlement of litigation, the construction and enforcement of settlement agreements is governed by the principles of state law applicable to contracts generally." *E. Energy, Inc. v. Unico Oil & Gas, Inc.*, 861 F.2d 1379, 1380 (5th Cir. 1988) (internal quotation marks omitted). Here, Texas law controls the determination of the enforcement of the settlement agreement. *Id.* "Under Texas law, settlement agreements are enforceable in the same manner as any other written contract." *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323 (5th Cir. 2006) (internal quotation marks omitted). "To form a binding contract, the parties must have a meeting of the minds[.] . . . All of the parties must assent to the same thing in the same sense at the same time, and their assent must comprehend the proposition as a whole." TEX. JUR. 3D § 68; *see also David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008). "Where a meeting of the minds is contested, as it is here, determination of the existence of a contract is a question of fact." *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App. 2000); *see also Haws & Garrett General Contractors, Inc. v.*

*Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609-10 (Tex. 1972) (determining whether there has been mutual assent requires drawing inferences from the parties' words and conduct and "[a]n inference is but a deduction which the trier of fact makes from the facts proved, the drawing of which is essentially the exercise of a fact finding function").   We review a district court's factual determination of whether there was a meeting of the minds, for clear error.  *See Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1416 (5th Cir. 1995).

We find that the district court did not clearly err in determining that Crowell and LINA were not negotiating the same claims and therefore, that the putative settlement agreement does not reflect a meeting of the minds.  The district court found that "each party was negotiating to settle different claims. [Crowell] intended to settle only part of the suit—claims for past payments. [LINA], on the other hand, intended to settle claims for future payments in addition to the past payments."  Examining the parties' communications does not reveal any clear error on the part of the district court in determining that the parties' negotiations were lopsided as to the extent of the claims being settled. In particular, Crowell's complaint sought to recover for "past benefits due . . . and future payments . . . for future benefits until the coverage amount [is] exhausted" on his claim for disability benefits that affected his work at ABX. Furthermore, Crowell's demand letter referenced both past and future claims, albeit with some ambiguity about the scope of the future benefits being claimed.[4]

---

[4] In *Woodson*, the district court participated in the parties' settlement conference, at which it believed the parties had reached a settlement as to all of the plaintiff's claims, and "stated unequivocally that it did not recall the express reservation of [a particular] claim plaintiff's counsel claims to have made."  57 F.3d at 1416.  However, the lower court "accepted plaintiff's counsel's [later] statements regarding her understanding of the . . . settlement [negotiations] and found that there had not been a meeting of the minds on that date."  *Id.* On appeal, we found that "[u]nder the circumstances, we cannot say that this finding is clearly erroneous."  *Id.*  Similarly here, the district court found that the parties were not negotiating about the same claims and there is no record evidence that shows the district court clearly erred in this finding.

Because we find that the district court did not clearly err in finding there was no meeting of the minds, we need not reach LINA's alternative arguments about the unenforceability of the settlement agreement.

## II.   LINA's Denial of Crowell's ERISA Claim was not Arbitrary and Capricious

### A.   Standard of Review

The standard of review for challenges to an administrator's denial of a participant's claim under an ERISA plan is well-settled in our cases: We review a district court's grant of summary judgment de novo, and, as here, where an ERISA benefits plan provides the plan administrator with discretionary authority to construe the terms of the plan, we review the plan administrator's denial of benefits for abuse of discretion. *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651-52 (5th Cir. 2009). "Abuse of discretion review is synonymous with arbitrary and capricious review in the ERISA context. . . . [W]e affirm an administrator's decision if it is supported by substantial evidence. Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations and internal quotation marks omitted). However, where LINA is both the Plan administrator and insurer, indicating a possible conflict of interest, our review is modified according to the Supreme Court's pronouncement in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, (2008).

Before *Glenn*, "if we identified a conflict of interest, we would apply a 'sliding scale' to assess the potential impact of the conflict." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 n.3 (5th Cir. 2009). Following, *Glenn*, our circuit joined the majority of the other circuits in repudiating application of a sliding scale standard of review of discretionary plan determinations where a possible conflict exists, and adopted the unitary abuse of discretion standard, weighing any conflict as a factor in that determination. *Id.* In deciding how

much weight to afford the apparent conflict here, we are guided by our decisions in *Holland* and *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465 (5th Cir. 2010). In *Schexnayder*, we explained our application of the *Glenn* test:

> In reviewing the plan administrator's decision, we take into account . . . several different considerations. These factors are case-specific and must be weighed together before determining whether a plan administrator abused its discretion in denying benefits. Any one factor may act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance.
> 
> The interaction between the factors and the substantial evidence test is a relatively new issue after the Supreme Court's decision in *Glenn*. We have considered the interplay in only one prior published decision--*Holland*--in which we found that the conflict of interest was a minimal factor and that the evidence was more than sufficient to support the denial of benefits. However, a reviewing court may give more weight to a conflict of interest, where the circumstances surrounding the plan administrator's decision suggest "procedural unreasonableness."

*Id.* at 469 (citations and internal quotation marks omitted).

Unlike in *Schexnayder*, where the plan administrator failed to address a contrary award by the Social Security Administration, *see* 600 F.3d at 471, we find no evidence here suggesting procedural unreasonableness. Neither do we find the protective mechanism found in *Holland*, where "the plan administrator established a trust to pay benefits to which it made periodic, irrevocable, and non-reversionary payments[ and t]herefore, 'a decision to pay benefits [did] not directly affect [the Administrator's] bottom-line.'" *Id.* at 470 (quoting *Holland*, 576 F.3d at 249). However, we need not decide how much weight should be given to this potential conflict here because it is clearly outweighed by the substantial evidence supporting LINA's decision.

**B.    LINA's Determination was Supported by Substantial Evidence**

We apply a two-step process for review of discretionary determinations by ERISA plan administrators: "First, we determine whether the Plan Administrator's determination was legally correct.  If the determination was legally correct, there is no abuse of discretion; if it was incorrect, then we must review whether that interpretation was an abuse of discretion.  Nonetheless, we are not confined to this test; we may skip the first step if we can more readily determine that the decision was not an abuse of discretion." *Holland*, 576 F.3d at 246 n.2 (citations omitted).  Crowell has argued here only in terms of the second test, and therefore, we need not determine whether LINA's interpretation of the Plan provisions was legally correct.

We find that LINA's determination was supported by substantial evidence, and therefore, LINA did not abuse its discretion in denying Crowell's claim.  This conclusion follows from our decision in *Cooper*, where we considered similar facts.  There, a physician of the plaintiff employee had originally concluded that Cooper was capable of performing some impaired functions (and was therefore not incapable of performing "any occupation" under the plan's terms).  592 F.3d at 656.  Cooper claimed that an "addendum letter" from this physician, which stated that "Ms. Cooper is totally disabled," undermined the plan administrator's decision that Cooper was not incapable of performing "any occupation."  *Id*.  We rejected Cooper's argument, concluding that the addendum letter did "not cancel out the specific findings in [the physician's] original evaluation" because there was "no evidence to show that [the physician] examined Ms. Cooper during the time between his original report . . . and his addendum."  *Id*.  We also said that the physician's conclusion that Cooper was "'totally disabled' does not suffice to establish disability under the language of the Plan, a determination which is a legal conclusion left to the Plan Administrator."  *Id*.  Ultimately, we found that the administrator's determination that Cooper was not totally disabled was supported by substantial evidence, as reflected, among other things, by the

11

determination of a vocational specialist that Cooper was capable of performing several occupations, that one of Cooper's physicians acknowledged that Cooper could return to part-time work, and at the time of the administrator's determination, Cooper was already working. *Id.* at 656-57.

The same points can be raised here: Crowell's own physician, Dr. Brown, determined that Crowell was able to return to work at the same position as before his medical condition and Dr. Brown's later, new opinion, expressing the opposite, was not based on a new evaluation or examination. Furthermore, even Dr. Brown's new determination confirmed that Crowell was capable of working forty hours per week, which would mean that he was capable of performing his Regular Occupation as defined in the national economy. Additionally, LINA's determination about the duties of Crowell's Regular Occupation in the national economy were determined by a vocational rehabilitation counselor. Finally, at the time LINA made its final determination denying Crowell's appeal, he was working again.

Crowell does not meaningfully dispute these facts. Instead, Crowell misunderstands the nature of LINA's determination: On appeal, Crowell contends that he "presented substantial evidence that he" was disabled. The issue of course, is whether LINA's denial was supported by substantial evidence, not whether Crowell presented substantial evidence of what he claims was a disability. *See Cooper*, 592 F.3d at 656 ("Support for the plaintiff's claim [that he was disabled] is not controlling because we must defer to the administrator's decision if the plan administrator's denial is supported by substantial evidence." (citing *Ellis v. Liberty Life Assur. Co.*, 394 F.3d 262, 273 (5th Cir. 2004))).

## CONCLUSION

The district court did not clearly err in determining that the settlement agreement was not a product of the meeting of the minds where Crowell and LINA were apparently negotiating different claims. Furthermore, LINA's

12

discretionary determination denying Crowell's claim was legally correct and supported by substantial evidence that outweighed a possible conflict of interest. Therefore, the orders of the district court denying Crowell's motion to enforce the settlement agreement and granting summary judgment for LINA are AFFIRMED.