# United States Court of Appeals for the Federal Circuit

---

**PLASMACAM, INC.,**
*Plaintiff-Appellee*

**v.**

**CNCELECTRONICS, LLC, FOURHILLS DESIGNS, LLC, THOMAS LEE CAUDLE, MARTHA JANE CAUDLE,**
*Defendants-Appellants*

---

2021-1689

---

Appeal from the United States District Court for the Eastern District of Texas in No. 4:19-cv-00037-ALM, Judge Amos L. Mazzant, III.

---

Decided: February 3, 2022

---

MARIA CRIMI SPETH, Jaburg & Wilk, P.C., Phoenix, AZ, argued for plaintiff-appellee. Also represented by AARON KEITH HAAR.

CHARLES JOHN ROGERS, Conley Rose, P.C., Houston, TX, argued for defendants-appellants. Also represented by THOMAS WARDEN.

---

Before NEWMAN, DYK, and REYNA, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* DYK.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

DYK, *Circuit Judge*.

PlasmaCAM, Inc. ("Plasmacam") sued CNCElectronics, LLC, Fourhills Designs, LLC, and Thomas and Martha Caudle (collectively "CNC") in the Eastern District of Texas for infringing U.S. Patent No. 7,071,441 ("the '441 patent") for which Plasmacam has an exclusive license. In December 2019, the parties notified the district court that they had settled the case. However, when the parties met to draft a formal agreement, it became evident that they interpreted the settlement differently, and further negotiations resulted. The parties eventually advised the district court that they had reached a complete agreement. The district court granted the motion to enforce Plasmacam's version of that agreement and ordered CNC to execute it.

CNC appeals. We hold that this court has jurisdiction over CNC's appeal. We also reverse the district court's judgment ordering CNC to execute Plasmacam's version of the settlement agreement and conclude that CNC's version of the agreement accurately reflects the parties' understanding. We remand for further proceedings not inconsistent with this opinion.

## BACKGROUND

This appeal arises out of a disputed settlement agreement. Plasmacam sued CNC in January 2019 for infringing the '441 patent, which claims a plasma cutting system and as to which Plasmacam has an exclusive license. The parties eventually agreed to settle the case. This agreement was reflected in an exchange of emails.

Email from Plasmacam's counsel:

The parties will enter into mutual releases which will include releasing CNCElectronics's

downstream customers from liability for infringing the patent at issue.

Email from CNC's counsel:

Provided that the release also covers future claims, then it looks like we have a settlement. I.e., the agreement includes a covenant not to sue (or license or similar) to cover Defendants and their downstream customers/users, from future infringement claims.

J.A. 730.

The parties then notified the district court that they had settled the case, and the court ordered them to submit final, closing paperwork by January 23, 2020. During that window, Plasmacam and CNC discussed the specific terms of the settlement agreement, but they disagreed as to the terms of the mutual release and as to the products that would be covered by the covenant not to sue ("Covered Products"). With respect to the release, the parties primarily disagreed on its scope. Plasmacam advocated for separate release obligations for it and CNC, requiring CNC to release Plasmacam from any causes of action that arose out of or related to the lawsuit, whereas Plasmacam would release CNC only for past and future claims for infringement of the '441 patent arising from the Covered Products. Conversely, CNC proposed a broad release, applying equally to each party, which released all past claims of any nature and appeared to cover claims not related to the '441 patent.

With respect to the definition of Covered Products in paragraph 2 of the draft agreement, Plasmacam proposed Covered Products be defined as "the components currently manufactured, sold or offered for sale by CNC which incorporate digital height control." J.A. 737. On January 7, 2020, CNC responded with a draft that defined Covered Products as "all past, present, and future components manufactured, sold, or offered for sale by CNC which

incorporate digital torch height control." J.A. 745. Plasmacam replied on January 15, and proposed to limit Covered Products to "components previously or currently manufactured, sold or offered for sale by CNC which incorporate digital torch height control." J.A. 754.

On January 17, CNC objected on the basis that its "products are very frequently revised or updated" so the limited definition "would be practically meaningless." J.A. 779. Plasmacam then agreed to "one additional compromise to address [CNC's] concern about routine updates and bug fixes," J.A. 760–61, and apparently proposed that Covered Products be defined as "(1) all components previously or currently manufactured, sold or offered for sale by CNC which incorporate digital torch height control; and (2) updates and bug fixes to the currently manufactured products," J.A. 1061. CNC rejected this "compromise" and proposed that Covered Products be "all components manufactured, sold or offered for sale by CNC which incorporate digital torch height control." J.A. 771. (At oral argument, Plasmacam agreed that this definition covered future products. Oral Arg. 19:22–19:55, *available at* https://oralarguments.cafc.uscourts.gov/default.aspx?fl=21-1689_10072021.mp3.) On January 21, Plasmacam stated that it "agreed to [CNC's] change in paragraph 2 (the definition of covered products)." J.A. 777.

However, the parties continued to disagree as to the terms of the mutual release and advised the district court that they "ha[d] a dispute regarding the scope of the mutual release." J.A. 522. As a result, the district court authorized each side to brief separate motions to enforce their respective interpretations of the settlement agreement. In the course of briefing, the parties came to an agreement regarding the mutual release. This agreement was reflected in Plasmacam's reply brief, which stated that the parties no longer disagreed, and that the mutual release should apply to claims that "were brought or should have

been brought, arising out of or relating to the Litigation." J.A. 1061. CNC's brief referenced the January 21 agreement with respect to Covered Products, stating "[Plasmacam] accepted [CNC's] correction to paragraph 2. . . that [Covered Products] should not be limited to current products." J.A. 568. However, Plasmacam's reply brief departed from the parties' January agreement in defining Covered Products as "(1) all components previously or currently manufactured, sold or offered for sale by CNC which incorporate digital torch height control; and (2) updates and bug fixes to the currently manufactured products." J.A. 1061. CNC did not raise this issue at a June 5 status conference set by the district court.

Thereafter, the district court granted Plasmacam's motion to enforce the settlement agreement and adopted Plasmacam's version of the agreement without addressing the January 21 agreement as to the definition of Covered Products.

CNC filed a motion for reconsideration urging the district court that Plasmacam's reply brief definition was not what the parties agreed to on January 21. Plasmacam filed a competing motion to enforce the court's order, contending that the parties never reached an agreement on January 21 because "that compromise was in exchange for the request that [CNC] compromise on the release paragraph." J.A. 1077. The district court denied CNC's motion for reconsideration and upheld its interpretation of Covered Products, explaining that the January 21 exchange showed that Plasmacam "did not agree to [CNC's] proposed Covered Products language in a vacuum." J.A. 10. Instead, Plasmacam made its compromise contingent on "other proposed changes" to the release. J.A. 10. The district court ordered CNC to execute the settlement agreement and promissory note and pay any unpaid settlement funds. CNC appeals.

DISCUSSION

I

We first address our jurisdiction to hear the case.  The parties agree that the court has jurisdiction, but disagree as to whether it arises from 28 U.S.C. §§ 1292(a)(1), (c)(1) (as an injunction), or 28 U.S.C. § 1295(a)(1) (as a final judgment).  Notwithstanding the parties' agreement, we are independently obligated to determine our jurisdiction.  *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  We conclude that the district court order to execute the settlement agreement constitutes either an appealable injunction or a final judgment.

A

Section 1292(a)(1) confers appellate jurisdiction over interlocutory district court orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions."  Whether an order constitutes an injunction does not turn on whether the district court labeled it as such, but instead on "the substantial effect of the order made."  *Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 742 n.7 (5th Cir. 2020) (quoting *McCoy v. La. State Bd. of Educ.*, 345 F.2d 720, 721 (5th Cir. 1965)); *see also Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 566 (7th Cir. 2000) ("The district judge did not use the magic word 'injunction,' but his order is injunctive in nature, requiring the [defendants] to perform enumerated steps under threat of the contempt power.").

Section 1292(a)(1) thus "applies to 'orders that are directed to a party, enforceable by contempt, and designed to accord . . . some or all of the substantive relief sought in the complaint in more than a temporary fashion.'"  *Police Ass'n of New Orleans v. City of New Orleans*, 100 F.3d 1159, 1166 n.5 (5th Cir. 1996) (quoting 16 Charles A. Wright et al., *Federal Practice & Procedure* § 3922, at 29 (1977)).  To

be sure, an order to pay money pursuant to an agreement, including a settlement agreement, alone does not constitute an appealable injunctive order. *See Saber v. FinanceAmerica Credit Corp.*, 843 F.2d 697, 702–03 (3d Cir. 1988). But an order granting specific performance on non-monetary terms is appealable as an injunction. *Resolution Tr. Corp. v. Ruggiero*, 994 F.2d 1221, 1225 (7th Cir. 1993); *see also Cohen v. Bd. of Trs. of the Univ. of Med. and Dentistry of N.J.*, 867 F.2d 1455, 1468 (3d Cir. 1989) ("[S]pecific enforcement of contractual undertakings by an order against the person has been regarded as a classic form of equitable relief . . . and if it is granted the order falls within section 1292(a)(1)."). Thus, for example, in *Supreme Fuels Trading FZE v. Sargeant*, the Eleventh Circuit held that it did not have jurisdiction to review an order requiring a defendant to "pay $5 million to [a plaintiff] pursuant to a settlement agreement," 689 F.3d 1244, 1245 (11th Cir. 2012), but the concurrence had "little doubt that the district court could have crafted an order" that conferred jurisdiction under § 1292(a)(1) by ordering specific performance apart from paying money, *id.* at 1247 (Pryor, J., concurring).

Here, the order required that CNC "[e]xecute the Settlement Agreement and Promissory Note." J.A. 12–13. Even if we do not have appellate jurisdiction over the order to pay money, the district court's order effectually mandated specific performance in requiring CNC to execute the settlement agreement.

B

Alternatively, we have jurisdiction over the district court's order because it is a final judgment. Section 1295(a)(1) confers jurisdiction to the Federal Circuit over "an appeal from a final decision of a district court . . . in any civil action arising under . . . any Act of Congress relating to patents." Final decisions are those that "end[] the litigation on the merits and leave[] nothing for the court to do

but execute the judgment." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373 (1981) (citations omitted); *see also Negron Gaztambide v. Hernandez Torres*, 145 F.3d 410, 415 (1st Cir. 1998) (noting that a district court's decision is final for purposes of appeal even if it leaves "some subsidiary matters undecided"); *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1117 n.1 (10th Cir. 2003) (explaining that court will have jurisdiction over appeal when unresolved issues "affect the court's execution of the judgment rather than the merits" of the judgment).  Whether an order is final does not depend on the specific "form of words" that it uses but instead on whether the order evinces the district court's clear intent to end the case.  *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1362–63 (Fed. Cir. 2003) (quoting *United States v. F. & M. Schaefer Brewing Co.*, 356 U.S. 227, 232 (1958) (citation omitted)).

Here, the record reveals that the parties did not contemplate further proceedings regarding any substantial matters.  The district court's order enforcing the settlement agreement evinces the court's clear intent to end the case by requiring the defendants to execute the settlement agreement and pay the funds owed under that agreement.  Any future action required—either of the parties or the district court—was merely subsidiary and concerned the execution of the judgment, not the scope of the district court's decision.

We therefore have jurisdiction over this appeal.

II

CNC contends that the district court erred in its enforcement of the settlement agreement because the enforcement order improperly limited the scope of the Covered Products to "(1) all components previously or currently manufactured, sold or offered for sale by CNC which incorporate digital torch height control; and (2) updates and bug fixes to the currently manufactured products."

J.A. 4.  Interpretation and enforcement of "a settlement agreement is not an issue unique to patent law" despite "arising in the context of a patent infringement suit."  *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d 1177, 1180 (Fed. Cir. 1999) (citing *Gjerlov v. Schuyler Labs., Inc.*, 131 F.3d 1016, 1020 (Fed. Cir. 1997)).  The parties dispute whether federal common law or Texas state law applies, but they nonetheless agree that the two are largely indistinguishable.  The Fifth Circuit reviews construction of an unambiguous contract's terms de novo, *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 490 (5th Cir. 2007), but ascertaining whether the parties mutually assented to contract terms is a factual question reviewed for clear error, *see Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1416 (5th Cir. 1995).

Here, the district court committed clear error when it limited Covered Products to "(1) all components previously or currently manufactured, sold or offered for sale by CNC which incorporate digital torch height control; and (2) updates and bug fixes to the currently manufactured products."  J.A. 4.  The record reflects that during negotiations after the initial agreement, the parties disagreed regarding which products the covenant not to sue would cover.  However, the record also establishes that Plasmacam ultimately agreed to CNC's proposed Covered Products definition on January 21.  J.A. 777 ("PlasmaCAM has agreed to your change in paragraph 2 (the definition of covered products.)").  That definition applied the covenant not to sue to "all components manufactured, sold or offered for sale by CNC which incorporate digital torch height control."  J.A. 771.

The district court's sole basis for disregarding this explicit agreement was that Plasmacam "'gave' [CNC] the Covered Products language in exchange for other proposed changes," i.e., the Covered Products concession was contingent on CNC's agreement to Plasmacam's proposal

regarding the mutual release. J.A. 10. There is no support in the record for any such qualification of the agreement. To be sure, the agreement concerning the definition of Covered Products was contingent on reaching an agreement with respect to the mutual release language. But the parties after January 21 advised the court that the only remaining dispute concerned "the scope of the mutual release," J.A. 522, and the record shows that following the January 21 agreement concerning Covered Products, the parties continued negotiations over the mutual release, and eventually reached an agreement. Nothing in Plasmacam's January 21 acceptance email made its assent to the Covered Products term contingent on adopting Plasmacam's version of the mutual release. At the June hearing on the parties' competing motions to enforce the settlement agreement, Plasmacam told the district court that the parties were "on the same page" regarding the agreement, and CNC confirmed that an agreement on the mutual release meant the parties did "not have an issue." J.A. 1335–36. Plasmacam also stated that the covenant not to sue was "not and has never been in dispute." J.A. 1076. The only possible agreement on the Covered Products term was the January agreement. In ordering that the parties sign an agreement including a different definition of "Covered Products," the district court committed clear error.

## CONCLUSION

The court has jurisdiction to hear this appeal. We reverse the district court's order concerning the Covered Products term; hold that the parties reached an agreement regarding the term on January 21; and remand for the district court to enter an appropriate order utilizing the January 21 agreed definition of Covered Products.

**REVERSED AND REMANDED**

# United States Court of Appeals
# for the Federal Circuit

---

**PLASMACAM, INC.,**
*Plaintiff-Appellee*

**v.**

**CNCELECTRONICS, LLC, FOURHILLS DESIGNS, LLC, THOMAS LEE CAUDLE, MARTHA JANE CAUDLE,**
*Defendants-Appellants*

---

2021-1689

---

Appeal from the United States District Court for the Eastern District of Texas in No. 4:19-cv-00037-ALM, Judge Amos L. Mazzant, III.

---

NEWMAN, *Circuit Judge,* dissenting.

I respectfully dissent. There was no "January agreement" of litigation settlement. Nor was there agreement at any other time on all the terms of settlement. PlasmaCAM and CNC negotiated and exchanged several draft agreements, but no final understanding was reached, no meeting of the minds and no signed agreement.

To the contrary: after the parties in December 2019 agreed in principle to settle this litigation, there followed extensive negotiations and draft agreements, until the parties told the district court that "despite their best efforts,

they have been unable to finalize and execute a written settlement agreement."  Joint Notice of Non-Settlement and Req. for Telephonic Conference at 1, *PlasmaCAM, Inc. v. CNCElectronics, LLC,* No. 419-cv-00037-ALM, (E.D. Tex. Jan. 23, 2020), ECF No. 51.

Nonetheless, my colleagues now hold that there was an enforceable binding settlement agreement that they call "the January agreement," although both sides and the district court agree that there was no such agreement.  My colleagues' holding is contrary to the law of contracts, and contrary to the principles of negotiation.  *See Crowell v. CIGNA Grp. Ins.*, 410 F. App'x 788 (5th Cir. 2011):

> To form a binding contract, the parties must have a meeting of the minds [.] ... All of the parties must assent to the same thing in the same sense at the same time, and their assent must comprehend the proposition as a whole.

*Id.* at 792 (quoting 14 Tex. Jur. 3d § 68).

The record is contrary to the panel majority's holding. Neither side argues for a "January agreement;" such an agreement is the unique creation of the panel majority.

### DISCUSSION

Contract formation requires mutuality.  "To form 'an enforceable contract, there must be a meeting of the minds on the essential terms of the agreement.'"  *O'Shaughnessy v. Young Living Essential Oils*, *L.C.*, 810 F. App'x 308, 311 (5th Cir. 2020) (quoting *Trans-Western Petroleum v. United States Gypsum Co.*, 830 F.3d 1171, 1176 (10th Cir. 2016)). Both CNC and PlasmaCAM consistently refused to accept certain terms of the other's draft settlement proposals.  The persistent sticking-point related to the issue of release and covenant not to sue for infringement by any and all unknown future CNC products.  The panel majority erroneously states that "CNC's version of the agreement accurately reflects the parties' understanding."  Maj. Op.

at 2. The district court correctly found that CNC's argument had no support in the record.

During the settlement negotiations both sides continually revised the other's draft agreement, until they reached an impasse and informed the district court that they could not agree. To demonstrate that no agreement was reached, contrary to the holding of the panel majority, I outline the exchange of drafts in the record of settlement negotiations.

## A

### *The settlement negotiations*

This infringement suit was filed by PlasmaCAM in January 2019, and the record in the Joint Appendix starts with an email from PlasmaCAM's counsel dated December 20, 2019, stating:

> PlasmaCAM proposes:
>
> CNCElectronics, LLC pays PlasmaCAM, Inc. $25,000 upon execution of a settlement agreement.
>
> [CNC will make a second payment of $25,000, and there is a penalty of $10,000 if certain dates are not met.]
>
> The parties will enter into mutual releases which will include releasing CNCElectronics's downstream customers from liability for infringing the patent at issue.

(email from PlasmaCAM's counsel, Dec. 20, 2019). That same day, CNC's counsel responded as follows:

> Provided that the release also covers future claims, then it looks like we have a settlement. I.e., the agreement includes a covenant not to sue (or license or similar) to cover Defendants and their downstream customers/users, from future infringement claims.

(email from CNC's counsel, Dec. 20, 2019). The district court recites that on December 23, 2019, PlasmaCAM by telephone told the court that the case had been settled, and the court issued an Order requiring the parties by January 23, 2020 to "file all papers necessary for the closing of this case." Mem. Op. & Order at 1, *PlasmaCAM, Inc. v. CNCElectronics, LLC,* No. 419-cv-00037-ALM, (E.D. Tex. June 22, 2020), ECF No. 66.

On December 30, 2019, PlasmaCAM sent CNC a draft settlement agreement, which contained, *inter alia*, the following provisions:

> 2. **Covered Products**. For purposes of this Agreement, the term: "Covered Products" shall mean the components currently manufactured, sold or offered for sale by CNC which incorporate digital height control.
>
> 7. **Release by PlasmaCAM**. Subject to PlasmaCAM's timely receipt of, and in partial consideration of the Settlement Payment, PlasmaCAM, on behalf of itself and its licensor, hereby releases CNC [and its customers, end users, …] from any and all actions, judgments, indebtedness, damages, losses, claims, demands, costs, expenses, attorneys' fees and liabilities of an nature whatsoever, whether known or unknown, suspected or unsuspected, for infringement … of the Patent that arose prior to the Effective Date, solely if and to the extent the alleged infringement arose from the making, use, sale, offer for sale, import, or export of the Covered Products. For the avoidance of doubt, the foregoing release of CNC distributors, customers and end users does not apply to, and PlasmaCAM is not restricted from taking any action regarding, any such person having made, selling, offering for sale, using or importing any product that is not a Covered Product. This release

is intended to bar claims for infringement of the Covered Products through the remainder of the life of the Patent.

On January 7, 2020 CNC sent PlasmaCAM a revised draft agreement, with the explanation:

> I have attached a revised draft of the settlement agreement and promissory note. … In the settlement agreement
>
> ● I modified section 2 to make sure the release and covenant not to sue applies to past, present, and future products.
>
> *  *  *
>
> ● I also tried to clarify the release in section 7 of the settlement agreement.

(email from CNC's counsel, Jan. 7, 2020). CNC revised section 2 to include future products, as follows:

> 2.  **Covered Products**.    For purposes of this Agreement, the term: "Covered Products" shall mean all past, present, and future components manufactured, sold or offered for sale by CNC which incorporate digital torch height control.

CNC revised section 7 to delete the limitation to infringement of "the Patent" (the patent in litigation), and to apply the release and covenant to CNC's new definition of Covered Products:

> 7.  **Release by PlasmaCAM**.    [Subject to PlasmaCAM's timely receipt of the Settlement Payment] PlasmaCAM … hereby releases and covenants not to sue CNC … for patent infringement … that arose prior to the Effective Date, or that will arise thereafter at any time during the remainder of the life of the Patent … of the Covered Products.

A few other changes were also made in the draft agreement.

On January 15, 2020 PlasmaCAM rejected CNC's changes to sections 2 and 7, and accepted some other changes.  PlasmaCAM explained:

> The reason for the change to Paragraph 2 is that although it is my client's intention to release your client for patent infringement on all products that they offer now or have offered in the past, if, after the settlement, your clients begin offering a new product that uses digital height control that is not currently offered and that design is even closer to the claims of the patent, PlasmaCAM reserves its right to enforce its patent rights as against that new product.

> My change back to "The Patent" in paragraph 7 is self-explanatory.

(email from PlasmaCAM's counsel, Jan. 15, 2020). PlasmaCAM's Jan. 15, 2020 changes are reflected in another draft agreement, with paragraphs 2 and 7 again limited to past and present CNC products:

> 2.  **Covered Products**.    For purposes of this Agreement, the term: "Covered Products" shall mean all components previously or currently manufactured, sold or offered for sale by CNC which incorporate digital torch height control.

For paragraph 7, PlasmaCAM restored its prior text that limited the license/covenant to "the Patent" in litigation, and to release only past and present infringing products as defined in Covered Products.

On January 17, 2020, CNC wrote: "your changes create two problems", referring to CNC's requested release from infringement of "PlasmaCAM's other patent", and also

stating that CNC's products are "frequently revised or up-dated." That same day PlasmaCAM's counsel replied:

> Those changes are not acceptable and were not part of our negotiated agreement. We agreed to settle this patent litigation, not all future potential patent infringement claims related to different patents and different products. Both of your changes attempt to expand the scope of our agreement to include releases never agreed to.
>
> I spoke with Jason, and we are willing to make an additional compromise to address your concern about routine updates and bug fixes. See attached. If this version is not acceptable, we are at a standstill and will need to make a motion to enforce the settlement as negotiated.

(email from PlasmaCAM's counsel, January 17, 2020).

CNC replied later the same day, disputing PlasmaCAM's position and stating:

> I strongly disagree with any suggestion that these standard terms change the scope of an agreement, if a complete agreement was actually reached. No one ever remotely suggested that a covenant not to sue would be limited to only current existing products as you proposed. … The mutual release as between the parties to the lawsuit was not limited to just one of PlasmaCAM's patents. That would be nonsensical and an open invitation for new infringement claims.

(email from CNC's counsel, January 17, 2020).

On January 20, 2020 CNC sent PlasmaCAM a revised draft agreement, stating "I have taken a slightly different approach … ." CNC amended paragraph 2 to remove PlasmaCAM's limitation to past and present products, as follows:

2. **Covered Products**.    For purposes of this Agreement, the term: "Covered Products" shall mean all components manufactured, sold or offered for sale by CNC which incorporate digital torch height control.

CNC converted paragraph 7 to a "mutual release" for infringement "that arose prior to the Effective Date," and added a new paragraph 8, as follows:

 8. **Covenant Not to Sue By PlasmaCAM.**  Subject to PlasmaCAM's timely receipt of, and in mutual consideration of the Settlement Payment, PlasmaCAM, on behalf of itself and its licensor, hereby covenants not to sue CNC or any of CNC's distributors, customers, suppliers, or end users, for any infringement of the Patent that arises from the making, use, sale, offer for sale, import or export of any Covered Products.

(email from CNC's counsel, Jan. 20, 2020).

In response PlasmaCAM sent CNC "a new draft," explaining:

[A]fter much discussion and review of the email correspondence and notes of settlement discussions, we are confident that it was never the intention to release your client from claims that are unrelated to the claims pending in this case.  Our proposal was to resolve this case, not to give up the right to pursue an entirely different claim that was never raised in this case.

PlasmaCAM agreed to CNC's change in paragraph 2, rejected CNC's revision of paragraph 7, and deleted CNC's new paragraph 8.  PlasmaCAM rewrote paragraph 7 to limit the release to the patent in suit, as follows:

 7. **Release by PlasmaCAM**.    Subject to PlasmaCAM's timely receipt of, and in partial

consideration of the Settlement Payment, PlasmaCAM, on behalf of itself and its licensor, hereby releases and covenants not to sue CNC and their respective officers, agents, servants, employees, and attorneys, and CNC's distributors, customers, suppliers, and end users from any and all actions, judgments, indebtedness, damages, losses, claims, demands, costs, expenses, attorneys' fees and liabilities of any nature whatsoever, whether known or unknown, suspected or unsuspected, for infringement (whether direct, contributory, inducement of infringement, or otherwise) of the Patent that arose prior to the Effective Date, or that will arise thereafter at any time during the remainder of the life of the Patent, provided that such infringement or alleged infringement arises from the making, use, sale, offer for sale, import, or export of the Covered Products. For the avoidance of doubt, the foregoing release of CNC distributors, customers and end users does not apply to, and PlasmaCAM is not restricted from taking any action against any such person for any infringement that does not arise from the making, selling, offering for sale, using or importing any Covered Product.

(email from PlasmaCAM's counsel, Jan. 21, 2020).

On January 22, 2020 CNC rejected PlasmaCAM's new draft agreement, stating that it "would limit the mutual release for past claims to only those claims that were asserted in the lawsuit." CNC stated: "we cannot agree to the narrow release as proposed in your latest draft." (email from CNC's counsel, Jan. 22, 2020).

On January 23, 2020, PlasmaCAM and CNC filed the Joint Notice of Non-Settlement and Request for Telephonic Conference, stating that "despite their best efforts, they have been unable to finalize and execute a written

settlement agreement", and requesting "a telephonic conference with the Court for guidance in this matter." Joint Notice of Non-Settlement and Req. for Telephonic Conference, *supra*, at 1.

## B

### *The district court's decision*

The district court held the requested telephonic conference on February 7, 2020. *See* Telephonic Hr'g Tr., *PlasmaCAM, Inc. v. CNCElectronics, LLC,* No. 419-cv-00037-ALM, (E.D. Tex. Feb. 7, 2020), ECF No. 15. The court then invited the parties to file motions elaborating their positions. The record shows further briefing and argument and apparently further negotiations; but on June 19, 2020 PlasmaCAM's counsel wrote the district court that "despite efforts of the Parties, the Parties were unable to reach an agreement."

On June 22, 2020, the district court issued its decision, finding that PlasmaCAM's sections 2, 7, and 8 stated "the parties' objective understanding of the disputed settlement terms," as follows:

> 2. **Covered Products**. For purposes of this Agreement, the term "Covered Products" shall mean (1) all components previously or currently manufactured, sold, or offered for sale by CNC which incorporate digital torch height control; and (2) updates and bug fixes to the currently manufactured products.
>
> 7. **Mutual Release.** Subject to PlasmaCAM's timely receipt of the Settlement Payment, the Parties each hereby release the other Party … from any and all actions, judgments, indebtedness, damages, losses, claims, demands, costs, expenses, attorney fees and liabilities, whether known or unknown, that were brought or should have been brought arising out of or relating to the Litigation.

> 8. **Covenant Not to Sue.** Subject to PlasmaCAM's timely receipt of the Settlement Payment, PlasmaCAM, on behalf of itself and its licensor, hereby covenants not to sue CNC or any of CNC's distributors, customers, suppliers, or end users for any infringement of the Patent that arises from the making, use, sale, offer for sale, import, or export of any Covered Products.

Mem. Op. & Order, *supra* at 4.

CNC declined to sign the settlement agreement containing these terms, and requested reconsideration. The district court on reconsideration confirmed its ruling. Recons. Mem. Op. & Order, *PlasmaCAM, Inc. v. CNCElectronics, LLC,* No. 419-cv-00037-ALM, (E.D. Tex. Dec. 9, 2020), ECF No. 81. Responding to CNC's argument that PlasmaCAM had agreed that the covenant not to sue would not be limited to past and present CNC products, the district court stated:

> Plaintiff did not agree to Defendants' proposed Covered Products language in a vacuum. Plaintiff "gave" Defendants' the Covered Products language in exchange for other proposed changes. When Defendants rejected those proposed changes, it rejected Plaintiff's counterproposal. Defendants cannot now claim the settlement terms were finalized back in January.

*Id.* at 5–6. Clear error has not been shown in the district court's finding. To the contrary, nowhere in the record is there even a remote suggestion of agreement by PlasmaCAM to yield to CNC's demands for immunity from suit for all possible new infringing CNC products—for this was the persistent unresolved issue throughout the parties' attempts to settle the pending litigation.

"Contract formation is a question of fact under Texas law." *J.D. Fields & Co., Inc. v. U.S. Steel Int'l, Inc.,* 426

F. App'x 271, 277 (5th Cir. 2011).  Clear error has not been shown in the district court's finding that PlasmaCAM did not agree to CNC's proposed terms of release and covenant not to sue.  My colleagues' contrary finding is devoid of support in fact and law.  "To state a claim for an enforceable contract, a plaintiff must allege … mutual assent or 'meeting of the minds' about the subject matter …." *Motten v. Chase Home Fin.*, 831 F. Supp. 2d 988, 1003 (S.D. Tex. 2011) (citing *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007)).

CNC now appeals the district court's ruling.

C

### *The panel majority's decision*

The district court found there was no meeting of the minds with respect to all the conditions of settlement, and the parties do not state otherwise.  Throughout this negotiation the parties never reached final agreement.  My colleagues ignore the record, for it is not disputed that the parties never came to terms.  The district court so recognized, and neither party argues otherwise.

The panel majority now holds not only that agreement was not reached on PlasmaCAM's terms, but the majority holds that agreement was reached on CNC's terms.  The majority finds a mysterious "January agreement," heretofore hidden from the parties and the district court, for in January the parties jointly told the district court that they "are unable to agree."

The majority also finds an agreement on December 20, 2019, despite CNC's explicit caveat that settlement is "[p]rovided　that　the　release　also　covers　future claims … I.e., the agreement includes a covenant not to sue (or license or similar) to cover Defendants and their downstream customers/users, from future infringement claims." Appx730.  The parties never agreed on "future infringement claims." The Restatement states the truism that:

> § 59. A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer.

Restatement (Second) of Contracts § 59 (1981). *See In re Golden Oil Co.*, 262 F. App'x 625, 627 (5th Cir. 2008) ("Where the essential terms of an agreement are left open for future negotiations, there is no mutual assent, and no binding contract." (citing *Sweeney v. Cross*, 476 S.W.2d 464, 465 (Tex. Civ. App. 1972)).

Agreement was never reached on CNC's *proviso*. Nonetheless, my colleagues now hold that final agreement was reached on December 20, 2019, despite the ensuing exchange of multiple agreement drafts, and despite the joint notice to the district court that the parties were unable to agree. The record is contrary to the panel majority's holding that the parties mutually agreed to CNC's terms. For an enforceable contract, there must be mutual assent to the formation of the contract. *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex. 1992) ("The material terms of the contract must be agreed upon before a court can enforce the contract. Where an essential term is open for future negotiation, there is no binding contract." (citing *Gerdes v. Mustang Exploration Co.,* 666 S.W.2d 640, 644 (Tex. App. 1984)).

Mutual contractual assent is expressed by the parties' signatures and delivery, with the intent to be obligated. *See Angelou v. African Overseas Union,* 33 S.W.3d 269, 278 (Tex. App. 2000). PlasmaCAM and CNC recognized the need for an executed settlement agreement, and they pursued negotiations to that end. It is not disputed that no agreement was reached. My colleagues' finding that settlement was reached on CNC's terms that were rejected by PlasmaCAM, is contrary to fundamental contract law.

This litigation is for the infringement by CNC of the PlasmaCAM patent. The issue on which the parties did not agree was whether CNC would be released from all possible future charges of infringement by unknown new CNC products. PlasmaCAM never agreed to this speculative condition, stating that they did not know what new products CNC might produce during the life of the patent.

PlasmaCAM sought to limit the settlement to the present litigation and the present products. CNC well understood that this was the area of disagreement. Yet the majority holds that PlasmaCAM agreed to the very issue on which this negotiation foundered. Indeed, the majority acknowledges that "[t]o be sure, the agreement concerning the definition of Covered Products was contingent on reaching an agreement with respect to the mutual release language." Maj. Op. at 10.

Nonetheless, the majority rules that PlasmaCAM agreed to CNC's demands in "the January 21 agreement." There is no January 21 agreement. The district court correctly dealt with this aspect. *See Hallmark v. Hand*, 885 S.W.2d 471, 476 (Tex. App. 1994) (an enforceable contract generally requires "execution and delivery of the contract with an intent that it become mutual and binding on both parties" (quoting *McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 477 (Tex. App. 1993)). From my colleagues' flawed ruling, I respectfully dissent.